1  Isela Castaneda (CA State Bar No. #223971)
   isela.castaneda@hro.com
2  HOLME ROBERTS & OWEN LLP
   560 Mission Street, 25th Floor
3  San Francisco, CA 94105-2994
   Telephone: (415) 268-2000
4  Facsimile: (415) 268-1999

5

6  Attorneys for Plaintiff                              E-filing
   BUSINESS ENTERPRISE INSTITUTE, INC.
7
                                                                          EDL
8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
                         SAN FRANCISCO DIVISION
10
11 **BUSINESS ENTERPRISE INSTITUTE,**          CASE NO. CV 10 2641
   **INC.**, a Colorado Corporation,
12                        Plaintiff,            **COMPLAINT FOR:**
13        v.                                    **(1) COPYRIGHT INFRINGEMENT (17**
14                                              **U.S.C. §§ 101 et seq.); and**
   **ORION CAPITAL GROUP INC.**, a California
15 Corporation,                                 **(2) INFRINGEMENT OF INTEGRITY OF**
                          Defendant.            **COPYRIGHT MANAGEMENT**
16                                              **INFORMATION (17 U.S.C. §1202).**
17
                                               **DEMAND FOR JURY TRIAL**
18

19        Plaintiff Business Enterprise Institute, Inc. ("BEI"), for its Complaint against Defendant

20 Orion Capital Group Inc. ("Orion") alleges, on knowledge with respect to its own acts and on

21 information and belief with respect to all other matters, as follows:

22                            **NATURE OF THE ACTION**

23        1.     This action for damages under the Copyright Act arises from Orion's unauthorized

24 and unlicensed reproduction and use in its business of certain of BEI's copyrighted newsletters.

25

26

27

28

---
Complaint for Copyright Infringement and Demand for Jury Trial
Business Enterprise Institute Inc. v. Orion Capital Group Inc.
Case No.

#52410 v1 saf

1 **JURISDICTION AND VENUE**

2    2.    BEI's causes of action arise under the Copyright Act, 17 U.S.C. §§ 101 *et seq*., and
3 the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 *et seq*., and this Court has jurisdiction
4 over these claims under 28 U.S.C. §§ 1331 and 1338.

5    3.    This Court has personal jurisdiction over Orion because, upon information and belief,
6 Orion has availed itself of the benefits of doing business in California by incorporating in California,
7 by marketing and distributing services in California, by distributing advertising and promotional
8 materials in California, including unauthorized copies of BEI's copyrighted newsletters, and by
9 operating a website accessible to California residents.

10    4.    Venue is proper in this Court under 28 U.S.C. § 1391 because the event giving rise to
11 the claims asserted in this Complaint arose in this District, and Orion is transacting business in this
12 District and is, thus, subject to the personal jurisdiction in this District.

13 **THE PARTIES**

14    5.    Plaintiff BEI is a Colorado Corporation with its principal place of business in Golden,
15 Colorado.

16    6.    BEI is the owner of the copyrights at issue in this action. BEI is the premier provider
17 of exit planning information to business owner advisors in the United States.

18    7.    Defendant Orion is a California corporation with a place of business at 1134 Crane
19 Street, #216, Menlo Park, California, 94024.

20    8.    Upon information and belief, Orion is a merger and acquisition advisory and
21 brokerage firm.

22    9.    Upon information and belief, Orion markets, advises, sells, and provides its services
23 to businesses in California.

24 **THE FACTS**

25 **BEI and Its Copyrighted Material**

26    10.    Since at least 1996, BEI has been and continues to be the premier provider of exit
27 planning information to business owner advisors throughout the United States.

28

2

#52410 v1 saf

1    11.    Since May of 2002, as part of BEI's business, BEI creates, offers, and distributes

2    newsletters with exit planning information throughout the United States.

3    12.    BEI has authored and created over 180 original and propriety newsletters related to

4    exit planning information. These newsletters are original works of authorship fixed in a tangible

5    medium of expression, which may not be reproduced or otherwise communicated without BEI's

6    prior authorization or consent.

7    13.    Among the many newsletters created, authored, developed, owned, and marketed by

8    BEI are:

9        "Why Exit Planning?";

10       "Setting Exit Objectives";

11       "What Is My Business Worth? (Step Two)";

12       "Working On - Not In - Your Business (Step Three)";

13       "Getting Top Dollar For Your Business (Step Four)";

14       "Transferring the Business to Children or Employees: A Recipe for Disaster? (Step Five)";

15       "Planning for a Rainy Day (Step Six)";

16       "Preserve Wealth: Give it Away! (Step Seven)";

17       "Why Business Owners Fail To Plan";

18       "Transfers to Insiders";

19       "ESOPs: Exit Opportunity for Business Owners"; and

20       "Sole Owner Continuity Plan".

21       14.    Through its normal course of business, BEI has obtained copyright registrations from

22    the United States Copyright Office for the newsletters identified in Paragraph 13 ("Copyrighted

23    Materials"). (Attached hereto as Exhibit 1 are true and correct copies of copyright registrations

24    received by BEI for its Copyrighted Materials, all of which are incorporated herein by reference.)

25       15.    BEI is the sole owner of the copyrights for the Copyrighted Materials and has

26    complied with all statutory requirements in securing federal statutory copyright registrations for its

27

28                                                    3

#52410 v1 saf

1  Copyrighted Materials. The Copyrighted Materials contain copyright notices identifying BEI as the
2  owner. (BEI's Copyrighted Materials are attached hereto as Exhibit 2.)

3      16.     Through its website, www.exitplanningforadvisors.com, BEI provides access to its
4  Copyrighted Materials to member/users that register to receive and use BEI's Copyrighted Materials
5  by purchasing a license.

6      17.     Access to BEI's Copyrighted Materials is only available to member/users who agree
7  to BEI's terms of use and register for an account. Access is secured and password protected. Under
8  BEI's terms of use members/users have BEI's permission to use and distribute BEI's newsletters,
9  including BEI's Copyrighted Materials, on a limited basis through tools available in each
10  member/users' individual account.

11     18.     BEI has spent substantial time, money, resources and effort to develop and distribute
12  its Copyrighted Materials.

13  **Orion's Unauthorized Copying, Displaying, or Distribution of BEI's Copyrighted Material**

14     19.     On its website, www.orioncg.com, Orion purports being a "Merger and Acquisition
15  (M&A) advisory and brokerage firm focused on selling businesses with revenues or valued between
16  $3 million and $50 million to private equity groups and strategic buyers worldwide." Orion further
17  purports using "a specialized sell-side process using superior marketing, skilled negotiation and
18  extensive deal experience to provide you with the exit you envision when you want it."

19     20.     Based on information known to date, Orion reproduced, distributed and displayed
20  copies of BEI's Copyrighted Materials as a part of its business without BEI's consent or
21  authorization. In addition, Orion has been producing, distributing and displaying unauthorized
22  reproductions or derivative works of BEI's Copyrighted Materials through at least one Internet
23  website, www.orioncg.com ("Infringing Materials"). (Examples of Orion's Infringing Materials are
24  attached hereto as Exhibit 3.)

25     21.     By way of example, Orion has copied, posted, and has otherwise made approximately
26  140 of copies of BEI's newsletters, including infringing copies of BEI's Copyrighted Materials,
27  freely and openly available for distribution on its website.

28

4

#52410 v1 saf

1    22.    Prior to BEI contacting Orion (as discussed further below), users of Orion's website
2    could access and view the Infringing Materials by merely clicking on a link to Orion's "Resources".
3    All unauthorized copies of BEI's newsletters, including unauthorized copies of BEI's Copyrighted
4    Materials, were accessible to any user viewing this link. User of Orion's website are also falsely
5    informed that the materials available are proprietary articles developed by Orion, when in reality, the
6    materials available were unauthorized copies or derivative works of BEI's newsletters and
7    Copyrighted Materials.

8    23.    Numerous instances of the Infringing Materials found on Orion's website are
9    identical or substantially similar (*i.e.*, with only a few unsubstantial modifications) to BEI's
10   Copyrighted Materials.    Further telling of Orion's infringing activity, the file names (*e.g.*,
11   soleownercontinuityplan**12**.php) of Orion's copied materials, including the Infringing Materials,
12   track the issue number of BEI's Copyrighted Materials (*e.g.*, Issue **12**, Sole Owner Continuity Plan).

13   24.    Upon information and belief, due to the substantial similarity between the Infringing
14   Materials and Copyrighted Materials, Orion had unauthorized access, individually or though the
15   assistance of a third-party, to BEI's newsletters and Copyrighted Materials.

16   25.    Orion intentionally removed BEI's copyright notices from the Infringing Materials.

17   26.    Upon information and belief, despite knowing of BEI's superior rights, Orion
18   knowingly and willfully made copies and/or derivative works from BEI's newsletters and
19   Copyrighted Materials for display, reproduction, and distribution on Orion's website.

20                        **BEI's Cease and Desist Letter to Orion**

21   27.    Upon learning about Orion's improper use of BEI's copyrighted material without
22   BEI's consent or authorization, BEI promptly sent a cease and desist letter to Mr. Neil Shroff,
23   Orion's Managing Director, on February 24, 2010.

24   28.    Orion responded on March 8, 2010 stating that it had temporarily removed the
25   Infringing Materials from its website and indicating a willingness to permanently remove BEI's
26   Copyrighted Materials, but only subject to various conditions. However, upon further investigation,
27   while the content available on the "Resources" link was modified to remove direct access to copies

28

5

#52410 v1 saf

1  of BEI's Copyrighted Materials, a Google-site search of Orion's website reveals that infringing
2  material is still publicly available. (See Exhibit 3.)

3      29.    Upon information and belief, Orion's infringing efforts are clearly directed at
4  attempting to divert potential licensees from BEI's website for its own personal gain.

5      30.    BEI contacted Orion on several more occasions to amicably resolve these issues but,
6  in the end, Orion refused to permanently remove copies of BEI's Copyrighted Materials from its
7  website, and refused to provide details about the extent of its infringement.

8      31.    Upon information and belief, despite having received notice of BEI's superior rights,
9  Orion knowingly and intentionally continues to offer copies of BEI's Copyrighted Materials to the
10 public without BEI's consent, permission or authorization.

11     32.    Upon information and belief, Orion's actions have been motivated purely by financial
12 gain, have been taken with full knowledge of BEI's superior legal rights, and are without regard to
13 the public interest to be free of confusion as to the source and origin of the Copyrighted Materials.

14     33.    BEI has lost and will continue to lose substantial revenues due to Orion's
15 unauthorized copying and use of the Copyrighted Materials and will sustain damage as a result of
16 Orion's wrongful conduct. Further, due to the potential for the unauthorized viral distribution of the
17 Infringing Materials and ensuing loss of control of the use of its Copyrighted Materials, BEI has
18 been irreparably harmed.

19                          **FIRST CLAIM FOR RELIEF**

20              **(COPYRIGHT INFRINGEMENT, 17 U.S.C. §§ 101 *et seq.*)**

21     34.    BEI incorporates by reference the allegations set forth in Paragraphs 1 through 33.

22     35.    BEI complied with the copyright laws of the United States and secured the exclusive
23 rights and privileges in and to all of its Copyrighted Materials.

24     36.    BEI is the sole owner and proprietor of all rights, title and interest in and to the
25 Copyrighted Materials.

26     37.    BEI has registered and received Certificates of Registration from the United States
27 Copyright Office for its Copyrighted Materials. Registration Nos. TX 6-701-914 and TX 6-701-915.

28

6

#52410 v1 saf

1    38.    Upon information and belief and due to the substantial similarity between the

2    Infringing Materials and Copyrighted Materials, Orion had access to BEI's Copyrighted Materials.

3    39.    Without authorization, Orion has copied, used, distributed, and/or published BEI's

4    Copyrighted Materials.  Orion's unauthorized copying, distribution, use, and/or reproduction of

5    BEI's original works of authorship constitute infringement of BEI's valid and subsisting copyrights

6    in violation of 17 U.S.C. §§ 101, *et seq.*

7    40.    Orion had notice of BEI's valid and subsisting copyrights to its Copyrighted

8    Materials.  Despite this notice, Orion has not ceased its infringing activities.  As such, Orion's

9    conduct is done with knowledge of BEI's copyrights and is, thus, willful.

10   41.    Upon information and belief, Orion has removed BEI's copyright notice as part of its

11   scheme to mislead the public.

12   42.    Orion has and will continue to derive and receive monetary gain, profits, and

13   economic advantage from its past and continuing infringement of BEI's valid Copyrighted

14   Materials.  As a result of Orion's conduct, BEI has suffered damages in an amount to be proven at

15   trial.

16   43.    BEI has been and continues to be irreparably harmed by such activities and has no

17   adequate remedy at law.

18   44.    BEI is entitled to an injunction restraining Orion and all related persons and/or

19   entities acting in concert from engaging in any further such acts in violation of the copyright laws.

20                              **SECOND CLAIM FOR RELIEF**
     **(INFRINGEMENT OF INTEGRITY OF COPYRIGHT MANAGEMENT INFORMATION,**
21                              **17 U.S.C. §1202)**

22   45.    BEI incorporates by reference the allegations set forth in Paragraphs 1 through 44.

23   46.    BEI complied with the copyright laws of the United States and secured the exclusive

24   rights and privileges in and to all of its Copyrighted Materials.  BEI is the sole owner and proprietor

25   of all rights, title and interest in and to the Copyrighted Materials.

26   47.    Certain information contained in BEI's Copyrighted Materials constitute "copyright

27   management information" ("CMI") within the meaning of the Digital Millennium Copyright Act.

28                                          7

#52410 v1 saf

1  CMI of BEI's Copyrighted Materials include the name of author, the copyright notice, and
2  information regarding the copyright owner.

3       48.    Upon information and belief, Orion downloaded or copied the Copyrighted Materials
4  and removed the name of the author of BEI's Copyrighted Materials, the other identifying
5  information and BEI's copyright ownership rights and notices without BEI's consent, permission or
6  authorization.

7       49.    Orion distributed copies of BEI's Copyrighted Materials through its website,
8  www.orioncg.com, knowing that the CMI for such materials had been removed and that their actions
9  would induce, enable, facilitate, or conceal an infringement of BEI's exclusive rights.

10      50.    These actions by Orion violate 17 U.S.C. § 1202, which protects the integrity of the
11  CMI.

12      51.    Orion's removal of the CMI is expressly designed to circumvent BEI's protection of
13  its Copyright Materials and has caused, and continues to cause, damages to BEI in an amount to be
14  proven at trial.

15                                   **JURY DEMAND**

16      52.    BEI requests a jury trial on issues so triable.

17                              **DEMAND FOR JUDGMENT**

18  WHEREFORE, BEI prays for judgment in its favor and against Orion as follows:

19      A.     Enter a judgment for compensatory and consequential damages in favor of BEI and
20  against Orion in an amount sufficient to compensate BEI for its losses;

21      B.     Enter a judgment that Orion be required to pay such actual damage as BEI has
22  sustained as a consequence of Orion's infringement of BEI's copyright and unlawful activities,
23  together with any profits of Orion that are attributable to said infringement and are not taken into
24  account in computing said actual damages;

25      C.     Order an accounting by Orion and payment to BEI of any and all profits arising from
26  the infringement of BEI's copyright and other wrongful acts described in this Complaint;

27

28                                         8
                Complaint for Copyright Infringement and Demand for Jury Trial
                  Business Enterprise Institute Inc. v. Orion Capital Group Inc.
                                        Case No.

#52410 v1 saf

1    D.    Enter temporary, preliminary and/or permanent injunctions to prevent further
2  copyright violations by Orion;

3    E.    Order the impoundment and destruction of all unauthorized materials incorporating
4  BEI's Copyrighted Materials, including all materials that Orion has distributed to its customers;

5    F.    Order that Orion and its divisions, subsidiaries, officers, agent and employees, and all
6  those person in active concert or participation with them who receive actual notice of the order by
7  personal service or otherwise be temporary, preliminary and/or permanently enjoined from
8  reproducing, preparing, copying, distributing, publishing, and/or using any unauthorized materials or
9  tangible things which are substantially similar to and/or infringe BEI's Copyrighted Materials;

10    G.    Award pre-judgment and post judgment interest, as provided by law;

11    H.    Award BEI's costs and expenses incurred in the prosecution of this action, including
12  expert witness fees and attorneys' fees; and

13    I.    Award BEI such other and further relief as the Court deems just and
14  appropriate.

15

16

17

18  Dated: June 16, 2010                             HOLME ROBERTS & OWEN LLP

19

20                                          By:

21                                              Isela Castaneda
                                                Attorneys for Plaintiff
22                                              BUSINESS ENTERPRISE INSTITUTE, INC.

23

24

25

26

27

28                                              9

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

0 020 868 134 2

**Form SE/Group**
UNITED STATES COPYRIGHT OFFICE

**TX 6-701-914**

**EFFECTIVE DATE OF REGISTRATION**

APR 19 2010

**APPLICATION RECEIVED**
4 19 2010

ONE DEPOSIT RECEIVED

**EXAMINED BY** DMZ

**CORRESPONDENCE** ☒

ISSN ▼

DO NOT WRITE ABOVE THIS LINE.

## 1

**TITLE ▼**

**Exit Planning Review**

List in order of publication

| | Volume▼ | Number▼ | Issue date on copies ▼ | Month, day, and year of publication ▼ |
|---|---|---|---|---|
| 1. | | 1 | 05/01/2002 | 05/01/2002 |
| 2. | | 2 | 06/15/2002 | 06/15/2002 |
| 3. | | 3 | 06/01/2002 | 06/01/2002 |
| 4. | | 4 | 06/15/2002 | 06/15/2002 |
| 5. | | 5 | 07/01/2002 | 07/01/2002 |
| 6. | | 6 | 07/15/2002 | 07/15/2002 |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |

## 2

**NAME AND ADDRESS OF THE AUTHOR/COPYRIGHT CLAIMANT IN THESE COLLECTIVE WORKS MADE FOR HIRE ▼**

Business Enterprise Institute, Inc. 741 Corporate Circle, Suite J Golden, Colorado 80401

**FOR NON-U.S. WORKS:** Author's citizenship ▼ | Domicile ▼ | Nation of publication ▼

**CERTIFICATION:** I, the undersigned, hereby certify that I am the copyright claimant or the authorized agent of the copyright claimant of the works identified in this application, that all the conditions specified in the instructions on the back of this form are met, that I have deposited two complimentary subscription copies with the Library of Congress, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X) _____ | Typed or printed name **Elizabeth Mower**

**PERSON TO CONTACT FOR CORRESPONDENCE ABOUT THIS CLAIM**
Name **Elizabeth Mower** | Daytime telephone **(303) 551-9699**
Address (if other than given below) _____

Fax **(303) 833-4979** | Email **emower@exitplanning.com**

| Certificate will be mailed in window envelope to this address: | |
|---|---|
| Name▼ Elizabeth Mower c/o Business Enterprise Institute, Inc. | |
| Number/Street/Apt ▼ 741 Corporate Circle, Suite J | |
| City/State/Zip▼ Golden, Colorado 80401 | |

**DEPOSIT ACCOUNT**
Account number _____
Name of account _____

Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form SE/Group Rev: 07/2008 Print: 07/2008—xx,000 Printed on recycled paper · U.S. Government Printing Office: 2008-xxx-xxx/xx,xxx

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form SE/Group**
UNITED STATES COPYRIGHT OFFICE

**TX 6-781-915**

EFFECTIVE DATE OF REGISTRATION

**APR 19 2010**

APPLICATION RECEIVED
4 19 2010
ONE DEPOSIT RECEIVED
4 19 2010
EXAMINED BY TM     CORRESPONDENCE ☒

**DO NOT WRITE ABOVE THIS LINE.**

## 1

**TITLE ▼**

**Exit Planning Review**

ISSN ▼

List in order of publication

| | Volume ▼ | Number ▼ | Issue date on copies ▼ | Month, day, and year of publication ▼ |
|---|---|---|---|---|
| 1. | | 7 | 08/01/2002 | 08/01/2002 |
| 2. | | 8 | 09/15/2002 | 09/15/2002 |
| 3. | | 9 | 09/01/2002 | 09/01/2002 |
| 4. | | 10 | 09/15/2002 | 09/15/2002 |
| 5. | | 11 | 10/01/2002 | 10/01/2002 |
| 6. | | 12 | 10/15/2002 | 10/15/2002 |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |

## 2

**NAME AND ADDRESS OF THE AUTHOR/COPYRIGHT CLAIMANT IN THESE COLLECTIVE WORKS MADE FOR HIRE ▼**

Business Enterprise Institute, Inc. 741 Corporate Circle, Suite J Golden, Colorado 80401

**FOR NON-U.S. WORKS:** Author's citizenship ▼     Domicile ▼     Nation of publication ▼

**CERTIFICATION** I, the undersigned, hereby certify that I am the copyright claimant or the authorized agent of the copyright claimant of the works identified in this application, that all the conditions specified in the instructions on the back of this form are met, that I have deposited two complimentary subscription copies with the Library of Congress, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X) _____     Typed or printed name **Elizabeth Mower**

**PERSON TO CONTACT FOR CORRESPONDENCE ABOUT THIS CLAIM**
Name **Elizabeth Mower**     Daytime telephone **(303) 551-9699**
Address (if other than given below) _____

Fax **(303) 835-4979**     Email **emower@exitplanning.com**

Certificate will be mailed in window envelope to this address:

Name ▼
Elizabeth Mower c/o Business Enterprise Institute, Inc.
Number/Street/Apt ▼
741 Corporate Circle, Suite J
City/State/Zip ▼
Golden, Colorado 80401

**DEPOSIT ACCOUNT**
Account number _____
Name of account _____

Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form SE/Group   Rev: 07/2008  Print: 07/2008 —xx,000  Printed on recycled paper     U.S. Government Printing Office: 2008-xxx-xxx/xx,xxx

# EXIT PLANNING REVIEW

**Exit Planning Information and Education for North America's Business Owners**

**The Exit Planning Review™** is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by Elizabeth Mower, with .*

For an overview of Exit Planning or our company, please visit our Web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 1

## Why Exit Planning?

Are you like many business owners?

- A majority of closely held and family owned businesses will change hands within the next five years[1]; but
- Many Business Owners may not have taken active steps to transition out of ownership.

Again, if you are like many of our readers, the reasons for failing to plan may be:

- You may have simply been too busy working in your business to be working on it — at least until now.
- You may be unsure of how to begin Exit Planning, who to use or even where to begin. Those uncertainties can be addressed today.

This issue of **The Exit Planning Review™** and every subsequent issue will encourage you to work on — not in — your business. Your education about the Exit Planning process begins now. Proper knowledge and preparation can possibly mean millions of dollars to you when you ultimately leave your company. Start Exit Planning today and you can help to avoid the sad (but too common) fate of the hypothetical business owners of T J Construction.

*Years ago, I met with Jim and Tim McCoy, two owners of a thriving construction company. What I assumed would be a business planning meeting, turned out to be a "We're getting out of business, how do we do it?" meeting. As successful as they were, they were tired of the government regulations, changing tax codes and day-to-day grind of running a multi-million dollar company.*

*A sale to a third party was not an option because Tim and Jim were not willing to stay on after a sale — and they had failed to develop a strong management team, which any savvy purchaser would require as a condition of purchasing the company. Transferring ownership to a group of key employees was also out of the question. None had been groomed to take on this type of responsibility and nothing had been done to fund this type of buy out.*

*Both owners were too young to have business active children so their only option was to liquidate.*

*Jim and Tim's highly profitable company had little worth beyond the value of its*

*tangible assets. After the sale of those assets, dozens of the employees lost jobs, the business disappeared, and Jim and Tim left millions of dollars on the table.*

How can you help to avoid Jim and Tim's fate? By engaging in an Exit Planning process that you control. An Exit Planning process begins by asking yourself the questions that follow. Your Exit Plan will begin to be created as you answer each of the following questions affirmatively:

1. Do you know your retirement goals and what it will take — in cash — to reach them?

2. Do you know how much your business is worth today, in cash?

3. Do you know the best way to increase the income stream generated by your ownership interest?

4. Do you know how to sell your business to a third party and possibly lower your taxes?

5. Do you know how to transfer your business to family members, co-owners, or employees while lowering taxes and potentially enjoying financial gain?

6. Do you have a continuity plan for your business if the unexpected happens to you?

7. Do you have a plan to help secure finances for your family if the unexpected happens to you?

These questions are almost misleadingly simple to ask, but to answer them affirmatively requires thought and action on your part.

Creating and implementing your Exit Plan may be the most important business and financial event of your life.

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

[1]*Winsby, Roger. Axiom Valuation, 2003.*

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2009 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is . . .

Exit Planning Information and Education for America's Business Owners

Unsubscribe to this newsletter



**Exit Planning Information and Education for North America's Business Owners**

*The Exit Planning Review™* is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by Elizabeth Mower, with .*

For an overview of Exit Planning or our company, please visit our Web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 2

## Setting Exit Objectives

"When a man does not know which harbor he is heading for, no wind is the right wind." So said Seneca almost 2,000 years ago. Today, speaking to business owners he might likely say, "Exit Planning for business owners must start with knowing your exit goals and objectives; otherwise, failure may be inevitable."

Why is Seneca's wise counsel so true today? In this first and most indispensable of The Seven Exit Planning Steps™, owners form their goals and objectives. But what should an owner's objectives be and why is it so vital to fix them before taking the next Step?

*I recently met with Ben, the owner of a 45-employee plastic extrusion company. He had long thought of transferring his business to a son and a key employee but had done little to prepare for that transfer. After years of procrastination, at age 58, he was finally ready to retire.*

*"Ben, it's helpful that you've decided on two of the critical Exit Objectives all business owners must face and answer. You've determined how much longer you want to work in the business. It seems you want to leave sooner rather than later. And second, you have decided to whom you wish to transfer the business, in your case your son and a key employee. But you still need to determine a third, critical, Exit Objective, how much money do you want or need when you leave the business? And, does that money need to be in cash or would you accept a promissory note?"*

Like many owners, Ben had two choices. First, he could retire now and sell the company for cash — but not to his son and key employee. They had no cash and no bank would lend an amount even close to the amount of money necessary to close the deal. If Ben wanted to sell now and achieve financial goals, he would have to sell to an outside third party with sufficient cash. His alternative was to sell the company to his son and key employee — knowing he would have to wait six to ten years to receive the entire purchase price.

Ben's situation illustrates why setting *consistent* and *achievable* objectives early in the Exit Planning process is so critical.

The three principal objectives common to nearly all business owners (and the questions that must be answered in setting these objectives) are:

1. Leaving the business on your timetable. How much longer do you want to remain active in the business?

2.  Leaving the business financially stable. Think of financial stability as a stream of after-tax income, adjusted for inflation. How much income will you need for the rest of your life after you leave the business? Do you want to be cashed out when you leave the business or are you willing to receive the purchase price over many years?

3.  Transferring the business to a particular person. To whom do you want to transfer the business? To a child? Key employee? Co-owner? Or perhaps to an outside party who can pay top dollar for the company?

If you don't answer these questions and thereby set your basic Exit Objectives, you may end up like Ben. He was left without a means to exit his business in style because he wanted to transfer the business to a key employee and he wanted cash. Your failure to set consistent and achievable objectives can leave you without the means to exit your business as well. If you prefer to "leave your business in style" you must formulate specific, consistent, attainable goals and objectives. Your Exit Objectives are the foundation for all subsequent planning, or in Seneca's words, "the harbor you must head for."

Know, however, that *many owners may not reach their objectives*. Why? Because they may not have a plan to achieve them. They may be too hurried, too focused on their businesses, and they may not know how to go about planning. Many owners understandably lack Exit Planning experience — they may not even know where to start. We suggest you begin your Exit Planning process by working with experienced advisors. Financial and insurance advisors often have the software and experience necessary to help you determine your financial needs based on your current net worth.

Future issues of this newsletter will discuss other common ownership objectives as well as how to resolve conflicts between objectives.

Watch for our next issue of **The Exit Planning Review™**. We will discuss Step Two of The Seven Step Exit Planning Process™ — Determining BusinessValue.

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.


Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

© 2006 - 2009 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is . . .

Exit Planning Information and Education for America's Business Owners

Unsubscribe to this newsletter

# EXIT PLANNING REVIEW

**Exit Planning Information & Education for America's Business Owners**

**The Exit Planning Review™** is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 3

## What Is My Business Worth?
*(Step Two)*

For many owners, the answer to one question determines their eagerness and ability to leave their companies: "How much is my business worth?" This question is indeed critical and answering it is the second step of your seven-step Exit Plan.

Take Ron Nee, the owner of Landscaping Supply Company, as an example.

*Ron was ready — and had been for several years — to sell his company but he felt it was worth little more than its net asset value — his industry's rule of thumb when valuing his type of company. While that value was not inconsiderable ($2 million), Ron wanted more. So, he continued to work in the business well past the point where he found it to be either fulfilling or energizing. In doing so, Ron committed a serious but common ownership mistake: working after the fun and challenge are gone on the mistaken assumption that the company can't be transferred for sufficient value.*

*Because Ron failed to get a proper and professional business valuation, he also failed to realize that his business could have been sold for significantly more money than his industry's "rule of thumb." And these failures were cumulative, for, in the end, he failed to exit his business when he wanted and for as much money as he wanted and needed.*

How can you help to avoid Ron Nee's predicament?

- Understand first that there are different types of valuations, performed by different types of valuation advisors, for different reasons.
- Appreciate that different appraisers charge vastly different amounts for a valuation; and
- Realize that the questions you need to ask now are what type of valuation do you need and who should perform it? The answers depend on how ready you are to leave your business.

If you are ready to exit the business now, (meaning last Friday) you need more than just a thumbnail sketch of value. You need a thorough valuation which includes a marketability component: Can your company be sold today at its appraised value?

An experienced appraiser active in today's merger and acquisition marketplace can give you an accurate answer to that question.

An accurate answer can tell you if your business is as ready to be sold as you are ready to leave it.

In Ron Nee's case he hired a certified valuation analyst whose thorough valuation included what the business would be worth in today's mergers and acquisitions market.

Expect to pay $5000 to $15,000 depending on the complexity of the valuation and whom you select to value the company.

On the other hand, if you and your business are several years away from ownership transition, a full-blown valuation may well be unnecessary. Instead you need a value approximation or range of value — a "ballpark estimate" of what your business is worth today. Think of an annual valuation as a test of whether the business is on track and of the distance to the station.

Depending on the size of your business and the need for certainty, your CPA can provide this type of valuation approximation for a modest fee.

Had Ron Nee started with a "ballpark" valuation, he would have discovered his business was likely worth significantly more than he thought. He could then have paid a professional valuation expert to determine the value and marketability of his company which would have opened the door for him to sell his business at that time.

"Ballpark" valuations, thorough valuation and marketability appraisals all have their place. Don't skimp on paying for an accurate valuation, but don't get one before you need it.

Why is a valuation necessary in this early stage of your Exit Planning? Simply because you and your financial and tax advisors must be able to determine if your financial objective can be met by a sale or other transfer of your company, to whom and when. Only a current business valuation can supply this vital information. Remember that the recent collapse of the mergers and acquisitions marketplace teaches us the valuable lesson that it takes *both* a strong company and a strong market to maximize business value.

*Bottom Line:* If you can realize your financial and other objectives today based on the current value and marketability of your business in today's market, why delay your exit?

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

GE-38722 (2/07)

**Exit Planning Information & Education for America's Business Owners**

**The Exit Planning Review™** is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 4

## Working On — Not In — Your Business
*(Step Three)*

*A number of years ago, I met with Diana Duff, the owner of Major Machining, Inc. (MMI), a machine shop. She wanted out. I suspected that her severe case of "early onset burnout" was due to the departure of her three-person management team six months earlier. These employees had not just left the company, they had set up a competing machine shop funded by the many MMI customers they took with them.*

*MMI was in shambles — it had no value because its owner had ignored the most important Value Driver — key employees. Duff could — and should — have considered a variety of tools to motivate and keep the company's top employees.*

What are Value Drivers? And why are they so important to you and your company? Value Drivers are the various characteristics of a business that professional buy-out experts believe drive business value upward and for which they are willing to pay top dollar. It is vital for you to know what these value drivers are if you want to successfully exit your business.

In Steps One and Two of The Seven Step Exit Planning Process™, you establish your Exit Objectives and determine the value of your business. Driving business value upward is a necessary step if, as is so often the case, you determine that the value of your company is not sufficient to satisfy your financial objective. During Step Three, you create the additional business value and cash flow necessary to help achieve your financial objectives.

To increase business value, you must target those same elements of a business that professional buy-out experts believe drive a business' value upward and for which they are willing to pay top dollar. These elements — characteristics that both help to reduce risk and improve return — are commonly referred to as "Value Drivers."

Value Drivers come in two varieties: generic (common to all industries) and industry specific. The generic Value Drivers are:

- A stable and motivated management team;
- Operating systems that improve sustainability of cash flows;
- Operating profit margins, at least as good as industry average;
- A solid, diversified customer base;
- Facility appearance consistent with asking price;
- A realistic growth strategy;

- Effective financial controls; and

- Good and improving cash flow.

Your industry also has specific or unique Value Drivers. For example, if you have a distribution company, a potential purchaser would look at the strength of the manufacturers you represent, the number of inventory turns per year, and the level of technical expertise your sales force possess.

For MMI, a number of Value Driver tools and techniques could have been used to motivate and keep key people. These tools included:

- Stock option, purchase or bonus plans subject to forfeiture if the key employees left prematurely;

- Non-qualified deferred compensation plans — with vesting — to encourage key employees to stay;

- A richer benefit package; or

- A defined succession plan, which included the key employees.

All of these tools can be designed not only to motivate and keep your top people — an essential Value Driver itself — but to reward them based on their efforts and success in driving business value upward. Look at your own business. Do you have an incentive system that:

- Is substantial in the eyes of the key employee?

- Has written performance standards, the attainment of which by the key employee not only results in a bonus to the key employee, but also increases the value of the company?

- Is part of a defined, written plan, communicated to the key employee?

- "Handcuffs" the key employee to the business by making it difficult for him to leave the business without forfeiting significant financial benefits?

As you can see from MMI's example, creating and fostering Value Drivers is crucial whether you simply wish to put more money in your pocket every year, or whether you want top dollar by selling your company.

It bears repeating that we believe you should concentrate on Value Drivers because that's what professional buyers may deem important and if they deem it important, it probably is. After all, they should have considerable experience in analyzing what increases a company's value.

How do you implement Value Drivers in your business?

- First, learn more about Value Drivers by contacting us.

- Talk to your advisory team members, especially your financial/insurance professional, your CPA, and perhaps business consultant or attorney.

- Stand above the fray at least one-half day per month. Look at your business through the eyes of someone interested in buying it. What do you see that would cause you to pay top dollar for your business? What would cause you to pay less for your business? When answering these questions look both at what your business is doing, as well as at what it is not. Viewing your business in this way is what we mean by working on your business, not just in it.

By increasing your knowledge, by working with capable advisors, and, most importantly, by thinking about what the business needs to become more valuable, you can work to put into place the elements necessary to drive the value of your business upward.

*Subsequent issues of **The Exit Planning Review**™ discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter                                                                                          GE-38721(3/07)

# EXIT PLANNING REVIEW

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review*™ is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 5

## Getting Top Dollar For Your Business
*(Step Four)*

What is a good way for you to get top dollar for your business?

First, consider selling to an outside third party, not to an insider such as a child, key employee or co-owner. Outside third parties typically have the cash and the ability to pay a higher earnings multiple for your business.

Secondly, proceed through planning steps prior to putting your company on the market. These steps, (discussed in the previous three issues of **The Exit Planning Review**™) are:

- Setting your Exit Objectives;
- Determining the value of your business;
- And, most importantly, taking action to implement and enhance the Value Drivers in your business.

Third, once you have maximized the value of your business, undertake the proper sale process which, if properly conducted, can potentially put more money in your pocket.

Let's look at how the sale process itself can make you money.

Basically, there are two ways to sell your company to a third party:

- A negotiated sale; or
- A controlled auction.

Maximizing the amount of cash you receive upon the sale of your company is the business owner's equivalent of hitting the game-winning home run. To hit this one out of the park, you must know what to do before you approach the batter's box. So, too, with a sale to a third party.

*Gary Reese, owner of Reese Diamond Importers, had been approached by a national competitor. Preliminary negotiations led to an offer of $7 million for the company. Before he accepted this offer, he called me with the good news. I urged him to contact an investment banker to orchestrate a controlled auction — a strategy Gary thought would scare off his suitor. The strategy scared the suitor alright — it offered another million dollars to avoid the auction. Gary subsequently hired the investment banker and sold his company (to another suitor) for $13 million cash. How?*

*First, Gary was clear about his objectives. He told his investment banker exactly what he needed financially, when he wanted to exit, how long he was willing to stay and in what capacity, and which companies he absolutely would not sell to. Using those criteria, Gary's investment banker developed a buyer profile and began to market the company.*

*Next, the investment banker developed a Deal Book, which told the story of Reese Diamond Importers. Qualified suitors signed confidentiality agreements and were sent the Deal Books. After studying the Books, three suitors entered the controlled auction in which they bid against each other for Gary's company. The auction concluded when Gary selected the suitor that met his financial objectives and other Exit Objectives and signed a non-binding Letter of Intent outlining the terms of the purchase.*

*The buyer's attorneys completed the Due Diligence process (learning everything about Reese Diamond Importers as they drafted) and negotiated the definitive Purchase Agreement. The closing was held and Gary left the table with $13 million in cash.*

If, as in Gary's case, a sale is properly organized and orchestrated, *the process can help to increase the amount of cash an owner receives.* In other words, Step Three, "Working On — Not In — Your Business," can help to increase your sale proceeds by making your company inherently more valuable. Step Four can help increase the cash you take from the closing table by properly managing the Sale Process.

Contrast the sale method used to sell Gary's business (a controlled auction) with the negotiated sale. In a negotiated sale, a buyer has identified your company for acquisition and you have decided to sell to that buyer. The buyer controls the timing, the cash, and generally has more leverage in negotiations.

A controlled auction introduces your company to a pre-selected list of qualified buyers. The key to a controlled auction is to have multiple buyers, bidding for your company at the same time, each having identical information and each being financially qualified to acquire your company. As a seller, you can get top dollar when these buyers compete against each other for the opportunity to purchase your company.

Controlled auctions are not a one-size-fits all proposition. They work best when:

1. The value of the company is at least several million dollars and large enough to attract the interest of multiple buyers.

2. An owner's transaction advisors are skilled and experienced in conducting controlled auctions. (This advisor is usually an investment banker or, for smaller deals, a business broker.)

Getting top dollar for your business requires more than having the best possible business to sell. It also requires selling your business using the method best suited to extract top dollar from the buyer's checkbook.

*Subsequent issues of* **The Exit Planning Review™** *discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

GE-38720(3/07)

# EXIT PLANNING REVIEW

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review*™ is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

PROVIDED BY:

Issue 6

## Transferring the Business to Children or Employees: A Recipe for Disaster?
*(Step Five)*

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule and other Exit Planning offers.

How do you successfully transfer your business to a child, key employee or co-owner? The most successful method is to follow a recipe that mixes, in equal measure, three key ingredients:

- One part: the ability, experience and dedication of the prospective new owners;

- One part: a company with strong, consistent cash flow and little debt; and

- One part: a transaction designed to prevent income taxes from eroding the cash flow available to you, the seller.

It should be obvious that a business cannot be successfully transferred unless the new ownership is capable. Furthermore, we cannot expect the transfer to be successful if the business itself lacks the ability to provide an ongoing stream of income with which to pay for the business acquisition. What may not be so obvious; however, is the corrosive affect of income taxation upon the transfer of a business to "insiders" — children, key employees or co-owners. Let's look at two key facts associated with transferring business to an insider.

First, *your children or key employees may not have cash to buy you out.* Therefore, any sale may take many years to complete — a potentially risky prospect. Further, *all of the cash used to purchase your ownership may come from one source: the future cash flow of the business after you have left it.*

Second, without planning, the cash flow can be taxed twice. It is this double tax, (sometimes totaling more than 50 percent) that can spell disaster for many internal transfers. Through effective tax planning, however, much of this tax burden can be legally avoided. Witness what Karl Clark did.

*Karl Clark agreed to sell his company to a key employee, Sharon Smith, for $1 million. This value was based on the company's annual $250,000 cash flow, which Karl historically took in the form of salary. While Karl understood that Sharon could not pay $1 million (nor could she secure financing), he did think that she could buy out the company over a five- or six-year period, using the available cash flow of the company.*

*Karl's calculations were way off the mark. The time needed for a buy out was at least 10 years. But why were his calculations so off base? In a word, taxes — actually in two words, double taxation. Without proper planning, this is what happens if Sharon buys the company (and what can happen to you when you*

*attempt to sell your business to your children or employees):*

1. *Sharon receives the cash flow ($250,000 per year) and is taxed on it at an estimated 35 percent federal and 5 percent state income tax rate (These rates may vary depending on total income and your state's tax rate).*

2. *Sharon pays $100,000 in taxes (40 percent of $250,000). This is the first tax on the business's cash flow.*

3. *Sharon pays the remaining $150,000 (net after tax) to Karl.*

4. *Karl pays an estimated 15 percent federal and 5 percent capital gains tax on the $150,000 he has received for the sale of his ownership interest, or $30,000 in taxes. This is the second tax on the original stream of income from the business. The result?*

5. *The company distributed $250,000 of its cash flow, but Karl was only able to put $120,000 in his pocket.*

**Without proper tax planning, you too, may experience an effective tax rate that could be in excess of 50 percent on the company's available cash flow used to fund your buyout.** This is likely to prevent, as it did for Karl and Sharon, a consummation of the sale of the business.

How might you design your sale to lower taxes and maximize the opportunity for success?

1. Plan. Like Karl, you should have a plan that yields you a greater after-tax amount for the sale of your company. Since the cash flow of the company may increase, the key is to provide Uncle Sam a smaller slice of the available cash flow.

2. Use an experienced advisory team, usually consisting of a business attorney, CPA and insurance or financial professional. They should understand the importance of tax sensitivity to both seller *and* buyer in order to make more money available to you.

3. In addition, you and your advisors should use a modest, but defensible valuation for the company. Because a lower value is used for the purchase price, the size of the tax bite is correspondingly reduced. The difference between what you will receive from the sale of your business, at a lower price, and what you want to be paid to you after you leave the business is "made good" through a number of different techniques to extract cash from the company after you leave it.

Tax planning for the transfer of your company to an insider takes time, planning and knowledge. But it can possibly save a tremendous amount of money. Take time now to begin the planning process.

- Learn as much as you can about how to best accomplish the transfer of your business.

- Seek the advice of your advisory team. Taking action sooner rather than later may help your business transfer recipe provide a tastier result. Bon appetit!

*Subsequent issues of **The Exit Planning Review**™ discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offers you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this

newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

**Exit Planning Information & Education for America's Business Owners**

**The Exit Planning Review™** is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule and other Exit Planning offers.

PROVIDED BY:

Issue 7

## Planning for a Rainy Day
*(Step Six)*

There may be nothing worse for a business than to have its owner suddenly die. . . especially if it's your business.

Let's look at what can happen when an owner dies.

*Joe Carpenter was the 55-year-old sole owner of a successful construction company. Joe hoped to sell his company to a third party in the next 18 months.*

*What Joe needed was a way to ensure that his company would survive if he died or became disabled during that period. Before he could put any plan into place, Joe was killed in a traffic accident. Soon after his death, key employees left his company for jobs with more certain futures. They feared that the company might not continue without Joe's leadership and personal financial backing.*

*Their departures caused a decrease in revenues, as well as the default on a number of contracts, which exposed the company to significant liabilities. Long-time customers grew uneasy with what they perceived to be a rudderless ship and took their business to Joe's competitors. Joe's bank grew uneasy as well and decided to call in his company's debt — debt Joe personally guaranteed.*

*Within weeks of Joe's death, his key managers were gone, his company defaulted on a number of contracts, revenues plummeted, customers jumped ship and any prospects of securing replacement financing quickly disappeared.*

As you can see, business continuity planning is vitally important to your company. Without a well thought out "survival plan," the consequences to employees, customers and most importantly, your family and estate are dire. (Don't think that your estate will escape the notice of your business creditors.)

Fortunately, there are a number of methods sole owners can implement today to help avoid the type of business collapse that Joe Carpenter's business experienced.

First, to keep key employees on board after your demise, offer ownership — perhaps via a buy and sell agreement, or offer additional compensation if key employees continue to run the company. The amount of compensation can be directly tied to company profitability and continued success. As an additional incentive, offer these employees a substantial bonus (called a "Stay Bonus") for staying with the company — one that can be funded with insurance and that can be accessed in case of your death.

discuss the arrangements you have made and show him or her that insurance to affect these plans is in place. Make sure your creditors are comfortable with your succession plan. Ask them what arrangements they would like to see in place.

Third, create a written plan that states: 1) who should take on the responsibility of running the business; 2) whether the business should be sold (if so, to whom) continued or liquidated; and 3) who your heirs should consult regarding the sale, continuation or liquidation of the company.

Finally, work closely with a capable insurance professional to make certain the necessary insurance (such as funding the Stay Bonus) is purchased by the proper entity, (you, your trust or the business) for the right reason and for the right amount.

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

# EXIT PLANNING REVIEW

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review™* is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing scheduleand other Exit Planning offers.

PROVIDED BY:

Issue 8

## Preserve Wealth: Give it Away!
*(Step Seven)*

The last step in your Exit Plan is Wealth Preservation Planning. But that doesn't mean you should wait until you are out of the business to begin actively preserving your wealth. In fact, if you wait until the value of your business is converted to cash, it may be too late to realize all of the benefits of wealth preservation. The most significant and powerful claimant to your wealth is the IRS — especially in the estate tax arena.

*George opened our meeting almost apologetically. "I knew I'd waited too long to begin gifting part of the company to my kids when I met with my CPA. She told me that, based on the company's pre-tax cash flow of $2 million per year, the company could be worth as much as $12 million to a third party. I had no idea! Since I don't need that much, I want to transfer at least half the value — at a lower valuation of course — before any possible sale. I'm looking at millions in gift taxes."*

*George hired a Certified Valuation Analyst (CVA) who valued the business at $9 million, a conservative but supportable valuation. The company's stock was recapitalized into voting and non-voting stock. Based on current tax case law, the CVA knew that she could justify discounting the value of non-voting stock (or a gift of a minority interest of the voting stock). In her opinion, the minority discount was 35 percent of the full fair market value of the stock. Even with the 35 percent discount, however, a gift of half of the company (now reduced to a gift of approximately $3 million) would cause the payment of a gift tax of approximately $500,000.*

*Like you, George was not particularly keen on paying a tax of $500,000. So he didn't. And he still gave away 50 percent of the company to his children. He did so by using the biggest lever in the Wealth Preservation Transfer Game: a "GRAT" — a Grantor Retained Annuity Trust.*

A GRAT is an irrevocable trust into which the business owner (and the Trustee of the GRAT) transfers some of his stock.

The GRAT must make a fixed payment (annuity) to the owner each year for a pre-determined number of years (in George's case, four years). At the end of this period, any stock remaining is transferred to the owner's children.

Stock transferred into a GRAT is treated as a gift — the amount of which is the value of the asset transferred *minus* the present value of the annuity which the owner will continue to receive. (George's advisors made sure that the present value of the annuity paid out over four years equaled the value of the stock transferred into the GRAT — therefore **no** gift was made by George.)

Another key to a GRAT's success is the transfer of an asset that appreciates in value and/or produces income in excess of 120 percent of the federal mid-term interest rate. This rate fluctuates monthly; for examplpe, the rate varied from 7.5% to 2% in the period 2003-2009.

Let's summarize what George did:

1. He transferred one-half of a business with a fair market value of $9-$12 million to his children in four years using none of his lifetime exemption.

2. He continued to receive all of the income from the company during that four-year period, because the annuity payment to George was designed to equal the amount of income expected from the stock transferred into the GRAT.

3. At the termination of the trust (four years) the trust asset, consisting of one-half of the company, was transferred to trusts for George's children, *free of any gift tax*.

These trusts were in turn established by George when the GRAT was created and contained his wishes regarding when, and if, the children were to receive money from those trusts.

This is *huge leverage*. And best of all, planning techniques such as GRAT's and the careful use of minority discounts, as well as a variety of other estate tax avoidance techniques, are likely available to you and your family.

Your financial, legal and tax advisors can provide you with more information about this aspect of the planning.

*Subsequent issues of **The Exit Planning Review**™ discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter                                                                                                    GE-38717(3/07)

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review*™ is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule

PROVIDED BY:

Issue 9

# Why Business Owners Fail To Plan

*Franklin Taft was understandably a bit neurotic. He was increasingly anxious to begin planning for his eventual departure from his business but his concerns prevented him from proceeding. "I'm too busy working in my business to think about how to leave it. Besides, I don't know what to do-and neither do my advisors."*

Sound familiar? In our experience, the primary reasons owners hesitate to begin the planning process are:

1.  You may be so busy fighting alligators that you don't have time to drain the swamp. Daily demands mean all of your time and energy are spent working in the business. You have little left to work on the business of leaving your business.

    **A solution:** spend a few hours learning what you need to know by reading *The Completely Revised How to Run Your Business So You Can Leave It In Style* and the provider of this newsletter can offer you additional material discussing Exit Planning.

2.  Owners may be unaware that there is a defined Exit Planning process that provides a template showing them the steps they can take in order to help them leave their businesses "In Style."

3.  Some lawyers, CPAs, insurance professionals and investment advisors-your professional advisors — may not know how to effectively work together to help you leave your business in style. If one of the professionals on your Advisory Team has provided you with a subscription to this newsletter, chances are good that he or she is informed and may specialize in helping owner/clients.

    **A solution:** *The Completely Revised How to Run Your Business So You Can Leave It In Style* book and the Companion Workbook provide the basics of the Exit Planning process. You need to know only WHAT needs to be done-a far easier task then learning HOW to accomplish what needs to be done. Leave the HOW to your advisors.

4.  Finally, (and this wasn't a problem for Franklin) many owners have a fear of the unknown-what will they do after they exit their businesses.

    At the risk of sounding like the dentist you feared as a child, "Trust me, it won't hurt." As a successful, smart business owner, you can both discover and create a new and fulfilling life apart from your business. Read Issue 13, "Former Owners Express No Regrets."

*Subsequent issues of **The Exit Planning Review**™ discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

**EXIT PLANNING REVIEW**

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review*™ is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule

PROVIDED BY:

Issue 10

## Transfers to Insiders

When transferring your company to insiders, a Low Value can put Dollars in your pocket.

Owners of successful businesses valued between $5 and $10 million face two difficult exit problems[1]:

1. Cash buyers are usually seeking larger companies; and

2. Owners are generally unwilling to assume a long-term installment note because of the risk of non-payment.

Given these hurdles, the owner has four transfer options:

1. Long term installment sale to employees;

2. Leveraged Management Buyout;

3. Employee Stock Ownership Plan; or

4. Modified installment/cash sale.

Let's look briefly at each.

**Long Term Installment Sale**
In this sale, the former owner holds a promissory note that the buyers (employees) pay off over a seven to ten year period. The note is secured by the assets and stock of the business and the personal guarantees and collateral (usually residences) of the buyers. Little or no money changes hands at closing. Of course, if the new management cannot maintain the company's profitability, the owner does not receive his purchase price.

**Leveraged Management Buyout**
An owner chooses this transaction structure when she wants to achieve the goals mentioned above and if her company has:

- A management team capable of operating and growing the business without owner input;

- Stable and predictable cash flow;

- Good prospects for future prosperity and growth; and

- A solid, tangible asset base.

Again, the key to this transaction structure is for the owner and management team to agree on a fair value for the company. Once agreed, the management team arranges the senior bank debt to fund a portion of the transaction. The

bank, in turn, requires management to make an equity investment prior to closing. At this point, the management team finds and offers an equity investor a complete package of price, terms, debt financing and management talent. If a private equity investor cannot be located under acceptable terms, the seller can elect to maintain an equity position in the company, or subordinate a term note to the bank.

**Employee Stock Ownership Plan (ESOP)**
Avid readers of **The Exit Planning Review™** recognize this transfer technique from our last issue of **The Review**. For our purposes here, in an ESOP arrangement, the owner is largely cashed out of the business, perhaps having to carry only a portion of the purchase price of the stock sold to management.

**Modified Buyout**
Of all the methods of "insider" transfers identified here, the Modified Buyout is the choice of many owners because it best meets the typical owner's objectives described earlier.

In a nutshell, an owner makes available a pool of non-voting stock (about 40 percent of total ownership) for current and future purchase by key employees. That stock is valued using an agreed upon Valuation Formula but adjusted downward using minority discounts *(to be affordable and to provide an incentive for employees to stay with the company.)* Employees purchase stock via a Stock Purchase Agreement. After the employees have paid for the stock (usually three to four years) the owner can then decide to:

1. Sell the balance of the company to key employees at true fair market value for cash because they can likely get bank financing;

2. Sell to an outside third party; or

3. Continue to own the company.

The advantages to the Modified Buyout are:

- Acquiring part of the company at a reduced cost rewards and motivates key employees;

- Key employees knowledgeable in business and trusted by owner receive the entire business; and

- Owner receives all of the company's fair market value.

The disadvantages to the owner are that:

- He does not receive the entire purchase price for three to four years; and

- He generally remains active in the business until the initial employee buy-in is completed.

In summary, the Modified Buyout works because the low initial value:

- Allows a buy out with future cash flow;

- Reduces taxes; and

- Provides an incentive and sets up a low price for the eventual cash buy out.

Creating and implementing your Exit Plan can be the most important business and financial event of your life.

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business*

*So You Can Leave It In Style™.*

[1]Kevin Short - Clayton Capital Partners

*^Top*

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

**Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.**

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter



**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review*™ is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

This issue is provided to you by , Elizabeth Mower.

For an overview of Exit Planning, please <u>visit our web site</u>.

<u>View my Executive Briefing schedule</u>

PROVIDED BY:

Issue 11

# ESOPs: Exit Opportunity for Business Owners

*Aesop is famous for his stories that teach important lessons but are fictional-and often fantastic. Our topic today, **ESOPs** (Employee Stock Ownership Plans) is similar. Fictional and often fantastic claims are made about what **ESOPs** can and cannot do. **ESOPs** can help business owners to achieve a number of important Exit Planning goals-namely, selling a business tax-free to employees for full market value. But as with a fable, readers must take care to separate the important lesson from the fiction. What can or should you believe about **ESOPs**? Read on.*

Business owners use **ESOPs** (Employee Stock Ownership Plans) as a tool to achieve three common Exit Objectives:

- To leave the business soon;
- To leave the business with cash adequate for financial stability; and
- To leave the business to employees

**What is an ESOP?**
An **ESOP** is a qualified retirement plan, typically a profit sharing plan, that must invest primarily in the stock of the sponsoring employer. It is subject to a number of legal requirements.

Armed with that basic information, let's look at how an **ESOP** helped one ficticious owner to achieve his Exit Objectives.

*Steve Victoria was the sole owner of VECI, a 35-person firm with annual revenues of $5 million and cash flow of $500,000.*

*After exploring a sale to a third party, Steve's business broker suggested that a cash sale was unlikely. A sale to employees was also problematic given their inability to obtain meaningful financing.*

*Until Steve came across an article about **ESOPs**, he thought that his only exit option was to gradually diminish his involvement in the hope that VECI could continue to distribute earnings to him. The article outlined a far different exit option. It said that Steve could cash out for fair value, his employees could own his company and, best of all, Steve would pay no taxes on the sale.*

Steve wasted no time contacting his advisors to see if an **ESOP** could work for him. His first question was: What companies are suited to an **ESOP**?

**ESOPs** do not work well for every company. To be successful, a company should have:

- Strong cash flow;

- A good management team that can carry on after an owner's departure;
- Little or no permanent debt;
- A relatively large payroll base;
- An alignment between shareholder and employee interests; and
- Adequate capitalization to sustain future growth.

**ESOP Advantages**
The biggest advantage in the minds of many owners is the fact that the funding of a purchase by an **ESOP** is accomplished via pre-tax instead of post-tax dollars. Running a close second is that if, after an **ESOP** purchases the owner's C corporation stock, the **ESOP** holds at least 30 percent of the corporation's outstanding stock, the shareholder's proceeds are tax-free so long as they are invested in U.S. stocks and bonds.[1]

Finally, national surveys indicate that a company's productivity improves after an **ESOP** is instituted.[2]

**ESOP Disadvantages**
For every silver lining there is a cloud and **ESOPs** are no exception.

- First, using (or establishing) an **ESOP** as your exit vehicle is expensive. Expect to pay between $25,000 and $100,000 depending on the complexity of your situation.

- Second, ERISA, the body of law that governs **ESOPs**, imposes significant responsibilities on its fiduciaries so that the interests of the participants and beneficiaries are represented and achieved. In fact, the sale of an owner's stock to an **ESOP** must be an arm's length transaction between the owner and an independently-directed and administered **ESOP**. If an owner makes any decision for the **ESOP** regarding the purchase or financing of his stock, he exposes himself to lawsuits claiming a breach of fiduciary obligation to the **ESOP** and its participants.

- Third, because an **ESOP** is required to repurchase stock from terminating employees, companies must make significant cash contributions to cover this liability — cash that would otherwise be used to grow the company.

- From the employee's perspective, **ESOPs** are not always welcomed with enthusiasm. Key management groups are given total ownership responsibility but must share the reward with other employees.

- And last, but not least is the lending bank's requirement that the **ESOP** have equity in the transaction before it will loan the **ESOP** the funds necessary to purchase the owner's stock. To create this equity, the company must pre-fund the **ESOP** with cash that otherwise would have been bonused to the owner.

Having weighed the pros and cons of **ESOPs**, Steve decided, with the help of his advisors, to pursue this exit strategy.

First, he had to set his objectives. Steve decided that he was willing to remain with VECI for two to three years and he wanted $2 million (after-taxes) from the sale.

Second, Steve hired an investment banker as his valuation expert to perform a preliminary valuation, the purpose of which was to determine if Steve's financial objective ($2 million after-tax) could be met.

Third, Steve had to develop a key employee incentive plan that would keep the key employees on board before and after Steve's departure.

Fourth, Steve's attorney drafted the **ESOP** document to comply with the many ERISA requirements regarding vesting, participation, and fiduciary duties. Attorneys also drafted the necessary documents to ensure the continuity of the company (should Steve die before the **ESOP** transaction could take place) and to provide for Steve's family (in the event of his death). The **ESOP** was then funded with cash contributions for three years, after which it was able to obtain bank financing sufficient to pay Steve the entire purchase price.

The final result? After 3 years, Steve sold his interest to the **ESOP** for $2.5 million. The bank required that he pledge half as collateral, to be released as the loan was paid down. Because Steve acquired blue chip stock and bonds, he was able to avoid the capital gains tax on the sale of his stock to the **ESOP**.

*Subsequent issues of **The Exit Planning Review™** discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

[1]Internal Revenue Code, Section 1042.
[2]The National Center for Employee Ownership, ^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter

# EXIT PLANNING REVIEW

**Exit Planning Information & Education for America's Business Owners**

*The Exit Planning Review™* is an opt-in, bi-monthly newsletter published by Business Enterprise Institute, Inc.

*This issue is provided to you by , Elizabeth Mower.*

For an overview of Exit Planning, please visit our web site.

View my Executive Briefing schedule

PROVIDED BY:

Issue 12

## Sole Owner Continuity Plan

**Making Sure the Business Continues When You Don't**
*Greg King barely survived helping his oldest son learn to drive and now it was time to teach his younger son. Before putting himself through on-the-road training one last time, Greg called his life insurance representative. "I have no co-owners to buy my company if I don't come home. What can I do?"*

Like many businesses, Greg's company (King Aviation Services) was not co-owned. And, like other such businesses, there was no plan to continue the business if something happened to the owner. This may be true in part because owners (like Greg) may not think about it and in part because some advisors may not raise issues that they may not be educated in. (After all, how do you continue a business when the only owner goes to the Big Hangar in the Sky?)

Fortunately, Greg's insurance representative was familiar with a solution called a Sole-Owner Continuity Plan (SOCP).

The challenge for Greg, and many sole-owners, is to provide for the business's continuity. That can be accomplished by securing the continued services of those employees who are indispensable to the business. If Greg does not return, the remaining employees may believe the survivability of the business (and their salaries) could be at great risk. Often, they, too, may leave. Without you and without the company's most valuable employees the business may not continue long enough to be sold, transferred, or even liquidated, on a financially sound basis.

For sole owners, the vital question is: how do you prevent these employees from leaving? One answer: bribe them. Your business should create a plan to compensate them at a substantially increased level (usually 50% to 100% more than they ordinarily receive) and *guarantee that payment with cash*. This plan is known as a Stay Bonus Plan and it is the first element of a sole owner continuity plan.

**Stay Bonus**
A stay bonus is a written, funded plan that provides monthly or quarterly bonuses, usually over a twelve to eighteen month period, for key employees who remain with the company during its transition from your ownership to new ownership or is liquidated in an orderly way. (New ownership may be a third party, employees, or family members.)

Typically, the stay bonus is funded with life insurance in an amount sufficient to pay the bonuses as well as to continue the normal salaries of your important employees over the specified time period. This insurance may be owned by the company or outside the company in an estate tax-sensitive trust. The plan is communicated to the important employees when it is created so that they know the plan and the money to fund it exist.

**Business Continuity Instructions**

The second element of the sole-owner continuity plan addresses the need for you, the owner, to communicate — in writing — to advisors and to family members what you want done with the business upon your death or permanent incapacity. Your instructions should cover three important issues.

- First, what key employee(s) can be given the responsibility to continue and to supervise business operations? Make financial decisions? Oversee internal administration? Owners should name names.

- Second, what advisors and others (such as a friendly competitor) should be consulted in the ownership transfer process? Again, owners should be specific.

- Third, do you want the business to be sold? If so, make a list of names and contacts of businesses that have expressed an interest in acquiring the company or who you think would be appropriate successor owners. On the other hand, you may want the business sold to key employees, continued in the family or liquidated. Whatever your choice, it must be made during your lifetime. Is there a better time than the present to do so?

Finally, once an owner has tackled these three issues, he or she should communicate those desires to family members and to advisors. This is the second element of the SOCP and can be easily accomplished using a Business Continuity Instruction Form(available through the provider of this newsletter).

The task of contemplating your demise can be made easier (for you and for your family) if you create and fund a stay bonus plan and complete a Business Continuity Instruction Form — sooner rather than later. Doing so is crucial if your business is to continue long enough to help provide your family the financial support you have worked so hard to achieve. To begin executing your Sole-Owner Continuity Plan, click on the above links to contact the provider of this newsletter.

*Subsequent issues of* **The Exit Planning Review™** *discuss all aspects of Exit Planning. The provider of this Newsletter (Elizabeth Mower) offer you unbiased information about what you may need to know — How To Run Your Business So You Can Leave It In Style™.*

^Top

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter, including Business Enterprise Institute, Inc., is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

© 2006 - 2007 Business Enterprise Institute, Inc. All Rights Reserved.

If you wish to unsubscribe to this newsletter click here emower@exitplanning.com. Our mailing address is .

Exit Planning Information & Education for America's Business Owners

Unsubscribe to this newsletter



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Why Exit Planning?

Are you like many business owners?

- A majority of closely held and family owned businesses will change hands within the next five years1; but
- Many Business Owners may not have taken active steps to transition out of ownership.

Again, if you are like many of our readers, the reasons for failing to plan
may be:

- You may have simply been too busy working in your business to be working on it — at least until now.
- You may be unsure of how to begin Exit Planning, who to use or even where to begin. Those uncertainties can be addressed today.

This issue and every subsequent issue will encourage you to work on — not in — your business. Your education about the Exit Planning process begins now. Proper knowledge and preparation can possibly mean millions of dollars to you when you ultimately leave your company. Start Exit Planning today and you can help to avoid the sad (but too common) fate of the hypothetical business owners of T J Construction.

*Years ago, I met with Jim and Tim McCoy, two owners of a thriving construction company. What I assumed would be a business planning meeting, turned out to be a "We're getting out of business, how do we do it?" meeting. As successful as they were, they were tired of the government regulations, changing tax codes and day-to-day grind of running a multi-million dollar company.*

*A sale to a third party was not an option because Tim and Jim were not willing to stay on after a sale — and they had failed to develop a strong management team, which any savvy purchaser would require as a condition of purchasing the company. Transferring ownership to a group of key employees was also out of the question. None had been groomed to take on this type of responsibility and nothing had been done to fund this type of buy out.*

*Both owners were too young to have business active children so their only option was to liquidate.*
*Jim and Tim's highly profitable company had little worth beyond the value of its tangible assets. After the sale of those assets, dozens of the employees lost jobs, the business disappeared, and Jim and Tim left millions of dollars on the table.*

How can you help to avoid Jim and Tim's fate? By engaging in an Exit Planning process that you control. An Exit Planning process begins by asking yourself the questions that follow. Your Exit Plan will begin to be created as you answer each of the following questions affirmatively:

1. Do you know your retirement goals and what it will take — in cash — to reach them?
2. Do you know how much your business is worth today, in cash?
3. Do you know the best way to increase the income stream generated by your ownership interest?
4. Do you know how to sell your business to a third party and possibly lower your taxes?
5. Do you know how to transfer your business to family members, co-owners, or employees while lowering taxes and potentially enjoying financial gain?
6. Do you have a continuity plan for your business if the unexpected happens to you?
7. Do you have a plan to help secure finances for your family if the unexpected happens to you?

These questions are almost misleadingly simple to ask, but to answer them affirmatively requires thought and action on your part.
Creating and implementing your Exit Plan may be the most important business and financial event of your life.

*1Winsby, Roger. Axiom Valuation. 2003.*

Go to archive list of our newsletter

ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Setting Exit Objectives
*(Step One)*

"When a man does not know which harbor he is heading for, no wind is the right wind." So said Seneca almost 2,000 years ago. Today, speaking to business owners he might likely say, "Exit Planning for business owners must start with knowing your exit goals and objectives; otherwise, failure may be inevitable."

Why is Seneca's wise counsel so true today? In this first and most indispensable of The Seven Exit Planning Steps™, owners form their goals and objectives. But what should an owner's objectives be and why is it so vital to fix them before taking the next Step?

*I recently met with Ben, the owner of a 45-employee plastic extrusion company. He had long thought of transferring his business to a son and a key employee but had done little to prepare for that transfer. After years of procrastination, at age 58, he was finally ready to retire.*

*"Ben, it's helpful that you've decided on two of the critical Exit Objectives all business owners must face and answer. You've determined how much longer you want to work in the business. It seems you want to leave sooner rather than later. And second, you have decided to whom you wish to transfer the business, in your case your son and a key employee. But you still need to determine a third, critical, Exit Objective, how much money do you want or need when you leave the business? And, does that money need to be in cash or would you accept a promissory note?"*

Like many owners, Ben had two choices. First, he could retire now and sell the company for cash — but not to his son and key employee. They had no cash and no bank would lend an amount even close to the amount of money necessary to close the deal. If Ben wanted to sell now and achieve financial goals, he would have to sell to an outside third party with sufficient cash. His alternative was to sell the company to his son and key employee — knowing he would have to wait six to ten years to receive the entire purchase price.

Ben's situation illustrates why setting *consistent* and *achievable* objectives early in the Exit Planning process is so critical.

The three principal objectives common to nearly all business owners (and the questions that must be answered in setting these objectives) are:

1. Leaving the business on your timetable. How much longer do you want to remain active in the business?
2. Leaving the business financially stable. Think of financial stability as a stream of after-tax income, adjusted for inflation. How much income will you need for the rest of your life after you leave the business? Do you want to be cashed out when you leave the business or are you willing to receive the purchase price over many years?
3. Transferring the business to a particular person. To whom do you want to transfer the business? To a child? Key employee? Co-owner? Or perhaps to an outside party who can pay top dollar for the company?

If you don't answer these questions and thereby set your basic Exit Objectives, you may end up like Ben. He was left without a means to exit his business in style because he wanted to transfer the business to a key employee and he wanted cash. Your failure to set consistent and achievable objectives can leave you without the means to exit your business as well. If you prefer to "leave your business in style" you must formulate specific, consistent, attainable goals and objectives. Your Exit Objectives are the foundation for all subsequent planning, or in Seneca's words, "the harbor you must head for."

Know, however, that *many owners may not reach their objectives.* Why? Because they may not have a plan to achieve them. They may be too hurried, too focused on their businesses, and they may not know how to go about planning. Many owners understandably lack Exit Planning experience — they may not even know where to start. We suggest you begin your Exit Planning process by working with experienced advisors. Financial and insurance advisors often have the software and experience necessary to help you determine your financial needs based on your current net worth.

Future issues of this newsletter will discuss other common ownership objectives as well as how to resolve conflicts between objectives.

Watch for our next issue — Determining BusinessValue.

Go to archive list of our newsletter

**ORION CAPITAL GROUP, INC.**
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## What Is My Business Worth?
### *(Step Two)*

For many owners, the answer to one question determines their eagerness and ability to leave their companies: "How much is my business worth?" This question is indeed critical and answering it is the second step of your seven-step Exit Plan.

Take Ron Nee, the owner of Landscaping Supply Company, as an example.

*Ron was ready — and had been for several years — to sell his company but he felt it was worth little more than its net asset value — his industry's rule of thumb when valuing his type of company. While that value was not inconsiderable ($2 million), Ron wanted more. So, he continued to work in the business well past the point where he found it to be either fulfilling or energizing. In doing so, Ron committed a serious but common ownership mistake: working after the fun and challenge are gone on the mistaken assumption that the company can't be transferred for sufficient value.*

*Because Ron failed to get a proper and professional business valuation, he also failed to realize that his business could have been sold for significantly more money than his industry's "rule of thumb." And these failures were cumulative, for, in the end, he failed to exit his business when he wanted and for as much money as he wanted and needed.*

How can you help to avoid Ron Nee's predicament?

- Understand first that there are different types of valuations, performed by different types of valuation advisors, for different reasons.
- Appreciate that different appraisers charge vastly different amounts for a valuation; and
- Realize that the questions you need to ask now are what type of valuation do you need and who should perform it? The answers depend on how ready you are to leave your business.

If you are ready to exit the business now, (meaning last Friday) you need more than just a thumbnail sketch of value. You need a thorough valuation which includes a marketability component: Can your company be sold today at its appraised value?

An experienced appraiser active in today's merger and acquisition marketplace can give you an accurate answer to that question.

An accurate answer can tell you if your business is as ready to be sold as you are ready to leave it.

In Ron Nee's case he hired a certified valuation analyst whose thorough valuation included what the business would be worth in today's mergers and acquisitions market.

Expect to pay $5000 to $15,000 depending on the complexity of the valuation and whom you select to value the company.

On the other hand, if you and your business are several years away from ownership transition, a full-blown valuation may well be unnecessary. Instead you need a value approximation or range of value — a "ballpark estimate" of what your business is worth today. Think of an annual valuation as a test of whether the business is on track and of the distance to the station.

Depending on the size of your business and the need for certainty, your CPA can provide this type of valuation approximation for a modest fee.

Had Ron Nee started with a "ballpark" valuation, he would have discovered his business was likely worth significantly more than he thought. He could then have paid a professional valuation expert to determine the value and marketability of his company which would have opened the door for him to sell his business at that time.

"Ballpark" valuations, thorough valuation and marketability appraisals all have their place. Don't skimp on paying for an accurate valuation, but don't get one before you need it.

Why is a valuation necessary in this early stage of your Exit Planning? Simply because you and your financial and tax advisors must be able to determine if your financial objective can be met by a sale or other transfer of your company, to whom and when. Only a current business valuation can supply this vital information. Remember that the recent collapse of the mergers and acquisitions marketplace teaches us the valuable lesson that it takes *both* a strong company and a strong market to maximize business value.

*Bottom Line:* If you can realize your financial and other objectives today based on the current value and marketability of your business in today's market, why delay your exit?

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

Case5:10-cv-02641-LHK   Document1   Filed06/16/10   Page51 of 69



**ORION**
CAPITAL GROUP

www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Working On — Not In — Your Business
### *(Step Three)*

*A number of years ago, I met with Diana Duff, the owner of Major Machining, Inc. (MMI), a machine shop. She wanted out. I suspected that her severe case of "early onset burnout" was due to the departure of her three-person management team six months earlier. These employees had not just left the company, they had set up a competing machine shop funded by the many MMI customers they took with them.*

MMI was in shambles — it had no value because its owner had ignored the most important Value Driver — key employees. Duff could — and should — have considered a variety of tools to motivate and keep the company's top employees.

What are Value Drivers? And why are they so important to you and your company? Value Drivers are the various characteristics of a business that professional buy-out experts believe drive business value upward and for which they are willing to pay top dollar. It is vital for you to know what these value drivers are if you want to successfully exit your business.

In Steps One and Two of The Seven Step Exit Planning Process™, you establish your Exit Objectives and determine the value of your business. Driving business value upward is a necessary step if, as is so often the case, you determine that the value of your company is not sufficient to satisfy your financial objective. During Step Three, you create the additional business value and cash flow necessary to help achieve your financial objectives.

To increase business value, you must target those same elements of a business that professional buy-out experts believe drive a business' value upward and for which they are willing to pay top dollar. These elements — characteristics that both help to reduce risk and improve return — are commonly referred to as "Value Drivers."

Value Drivers come in two varieties: generic (common to all industries) and industry specific. The generic Value Drivers are:

- A stable and motivated management team;
- Operating systems that improve sustainability of cash flows;
- Operating profit margins, at least as good as industry average;
- A solid, diversified customer base;
- Facility appearance consistent with asking price;
- A realistic growth strategy;
- Effective financial controls; and
- Good and improving cash flow.

Your industry also has specific or unique Value Drivers. For example, if you have a distribution company, a potential purchaser would look at the strength of the manufacturers you represent, the number of inventory turns per year, and the level of technical expertise your sales force possess.

For MMI, a number of Value Driver tools and techniques could have been used to motivate and keep key people. These tools included:

- Stock option, purchase or bonus plans subject to forfeiture if the key employees left prematurely;

Case5:10-cv-02641-LHK   Document1   Filed06/16/10   Page52 of 69

- Non-qualified deferred compensation plans — with vesting — to encourage key employees to stay;
- A richer benefit package; or
- A defined succession plan, which included the key employees.

All of these tools can be designed not only to motivate and keep your top people — an essential Value Driver itself — but to reward them based on their efforts and success in driving business value upward. Look at your own business. Do you have an incentive system that:

- Is substantial in the eyes of the key employee?
- Has written performance standards, the attainment of which by the key employee not only results in a bonus to the key employee, but also increases the value of the company?
- Is part of a defined, written plan, communicated to the key employee?
- "Handcuffs" the key employee to the business by making it difficult for him to leave the business without forfeiting significant financial benefits?

As you can see from MMI's example, creating and fostering Value Drivers is crucial whether you simply wish to put more money in your pocket every year, or whether you want top dollar by selling your company.

It bears repeating that we believe you should concentrate on Value Drivers because that's what professional buyers may deem important and if they deem it important, it probably is. After all, they should have considerable experience in analyzing what increases a company's value.

How do you implement Value Drivers in your business?

- First, learn more about Value Drivers by contacting us.
- Talk to your advisory team members, especially your financial/insurance professional, your CPA, and perhaps business consultant or attorney.
- Stand above the fray at least one-half day per month. Look at your business through the eyes of someone interested in buying it. What do you see that would cause you to pay top dollar for your business? What would cause you to pay less for your business? When answering these questions look both at what your business is doing, as well as at what it is not. Viewing your business in this way is what we mean by working on your business, not just in it.

By increasing your knowledge, by working with capable advisors, and, most importantly, by thinking about what the business needs to become more valuable, you can work to put into place the elements necessary to drive the value of your business upward.

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes ficticious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



## Getting Top Dollar For Your Business
### *(Step Four)*

What is a good way for you to get top dollar for your business?

First, consider selling to an outside third party, not to an insider such as a child, key employee or co-owner. Outside third parties typically have the cash and the ability to pay a higher earnings multiple for your business.

Secondly, proceed through planning steps prior to putting your company on the market. These steps, (discussed in the previous three issues) are:

- Setting your Exit Objectives;
- Determining the value of your business;
- And, most importantly, taking action to implement and enhance the Value Drivers in your business.

Third, once you have maximized the value of your business, undertake the proper sale process which, if properly conducted, can potentially put more money in your pocket.

Let's look at how the sale process itself can make you money.

Basically, there are two ways to sell your company to a third party:

- A negotiated sale; or
- A controlled auction.

Maximizing the amount of cash you receive upon the sale of your company is the business owner's equivalent of hitting the game-winning home run. To hit this one out of the park, you must know what to do before you approach the batter's box. So, too, with a sale to a third party.

*Gary Reese, owner of Reese Diamond Importers, had been approached by a national competitor. Preliminary negotiations led to an offer of $7 million for the company. Before he accepted this offer, he called me with the good news. I urged him to contact an investment banker to orchestrate a controlled auction — a strategy Gary thought would scare off his suitor. The strategy scared the suitor alright — it offered another million dollars to avoid the auction. Gary subsequently hired the investment banker and sold his company (to another suitor) for $13 million cash. How?*

*First, Gary was clear about his objectives. He told his investment banker exactly what he needed financially, when he wanted to exit, how long he was willing to stay and in what capacity, and which companies he absolutely would not sell to. Using those criteria, Gary's investment banker developed a buyer profile and began to market the company.*

*Next, the investment banker developed a Deal Book, which told the story of Reese Diamond Importers. Qualified suitors signed confidentiality agreements and were sent the Deal Books. After studying the Books, three suitors entered the controlled auction in which they bid against each other for Gary's company. The auction concluded when Gary selected the suitor that met his financial objectives and other Exit Objectives and signed a non-binding Letter of Intent outlining the terms of the purchase.*

*The buyer's attorneys completed the Due Diligence process (learning everything about*

*Reese Diamond Importers as they drafted) and negotiated the definitive Purchase Agreement. The closing was held and Gary left the table with $13 million in cash.*

If, as in Gary's case, a sale is properly organized and orchestrated, *the process can help to increase the amount of cash an owner receives.* In other words, Step Three, "Working On — Not In — Your Business," can help to increase your sale proceeds by making your company inherently more valuable. Step Four can help increase the cash you take from the closing table by properly managing the Sale Process.

Contrast the sale method used to sell Gary's business (a controlled auction) with the negotiated sale. In a negotiated sale, a buyer has identified your company for acquisition and you have decided to sell to that buyer. The buyer controls the timing, the cash, and generally has more leverage in negotiations.

A controlled auction introduces your company to a pre-selected list of qualified buyers. The key to a controlled auction is to have multiple buyers, bidding for your company at the same time, each having identical information and each being financially qualified to acquire your company. As a seller, you can get top dollar when these buyers compete against each other for the opportunity to purchase your company.

Controlled auctions are not a one-size-fits all proposition. They work best when:

1. The value of the company is at least several million dollars and large enough to attract the interest of multiple buyers.
2. An owner's transaction advisors are skilled and experienced in conducting controlled auctions. (This advisor is usually an investment banker or, for smaller deals, a business broker.)

Getting top dollar for your business requires more than having the best possible business to sell. It also requires selling your business using the method best suited to extract top dollar from the buyer's checkbook.

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes ficticious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

Transferring the Business to Children or Employees: A Recipe for Disaster?    Page 1 of 2

Case5:10-cv-02641-LHK   Document1   Filed06/16/10   Page55 of 69



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

**Transferring the Business to Children or Employees: A Recipe for Disaster?**
*(Step Five)*

How do you successfully transfer your business to a child, key employee or co-owner? The most successful method is to follow a recipe that mixes, in equal measure, three key ingredients:

- One part: the ability, experience and dedication of the prospective new owners;
- One part: a company with strong, consistent cash flow and little debt; and
- One part: a transaction designed to prevent income taxes from eroding the cash flow available to you, the seller.

It should be obvious that a business cannot be successfully transferred unless the new ownership is capable. Furthermore, we cannot expect the transfer to be successful if the business itself lacks the ability to provide an ongoing stream of income with which to pay for the business acquisition. What may not be so obvious; however, is the corrosive affect of income taxation upon the transfer of a business to "insiders" — children, key employees or co-owners. Let's look at two key facts associated with transferring business to an insider.

First, *your children or key employees may not have cash to buy you out.* Therefore, any sale may take many years to complete — a potentially risky prospect. Further, *all of the cash used to purchase your ownership may come from one source: the future cash flow of the business after you have*

*left it.*

Second, without planning, the cash flow can be taxed twice. It is this double tax, (sometimes totaling more than 50 percent) that can spell disaster for many internal transfers. Through effective tax planning, however, much of this tax burden can be legally avoided. Witness what Karl Clark did.

*Karl Clark agreed to sell his company to a key employee, Sharon Smith, for $1 million. This value was based on the company's annual $250,000 cash flow, which Karl historically took in the form of salary. While Karl understood that Sharon could not pay $1 million (nor could she secure financing), he did think that she could buy out the company over a five- or six-year period, using the available cash flow of the company.*

*Karl's calculations were way off the mark. The time needed for a buy out was at least 10 years. But why were his calculations so off base? In a word, taxes — actually in two words, double taxation. Without proper planning, this is what happens if Sharon buys the company (and what can happen to you when you attempt to sell your business to your children or employees):*

1. *Sharon receives the cash flow ($250,000 per year) and is taxed on it at an estimated 35 percent federal and 5 percent state income tax rate(These rates may vary depending on total income and your state's tax rate).*
2. *Sharon pays $100,000 in taxes (40 percent of $250,000). This is the first tax on the business's cash flow.*
3. *Sharon pays the remaining $150,000 (net after tax) to Karl.*
4. *Karl pays an estimated 15 percent federal and 5 percent capital gains tax on the $150,000 he has received for the sale of his ownership interest, or $30,000 in taxes. This is the second tax on the original stream of income from the business. The*

Case5:10-cv-02641-LHK Document1 Filed06/16/10 Page56 of 69

result?

5. *The company distributed $250,000 of its cash flow, but Karl was only able to put $120,000 in his pocket.*

**Without proper tax planning, you, too, may experience an effective tax rate that could be in excess of 50 percent on the company's available cash flow used to fund your buyout.** This is likely to prevent, as it did for Karl and Sharon, a consummation of the sale of the business.

How might you design your sale to lower taxes and maximize the opportunity for success?

1. Plan. Like Karl, you should have a plan that yields you a greater after-tax amount for the sale of your company. Since the cash flow of the company may increase, the key is to provide Uncle Sam a smaller slice of the available cash flow.
2. Use an experienced advisory team, usually consisting of a business attorney, CPA and insurance or financial professional. They should understand the importance of tax sensitivity to both seller *and* buyer in order to make more money available to you.
3. In addition, you and your advisors should use a modest, but defensible valuation for the company. Because a lower value is used for the purchase price, the size of the tax bite is correspondingly reduced. The difference between what you will receive from the sale of your business, at a lower price, and what you want to be paid to you after you leave the business is "made good" through a number of different techniques to extract cash from the company after you leave it.

Tax planning for the transfer of your company to an insider takes time, planning and knowledge. But it can possibly save a tremendous amount of money. Take time now to begin the planning process.

- Learn as much as you can about how to best accomplish the transfer of your business.
- Seek the advice of your advisory team. Taking action sooner rather than later may help your business transfer recipe provide a tastier result. Bon appetit!

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Planning for a Rainy Day
*(Step Six)*

There may be nothing worse for a business than to have its owner suddenly die. . .
especially if it's your business.

Let's look at what can happen when an owner dies.

*Joe Carpenter was the 55-year-old sole owner of a successful construction company. Joe
hoped to sell his company to a third party in the next 18 months.*

*What Joe needed was a way to ensure that his company would survive if he died or became
disabled during that period. Before he could put any plan into place, Joe was killed in a
traffic accident. Soon after his death, key employees left his company for jobs with more
certain futures. They feared that the company might not continue without Joe's leadership
and personal financial backing.*

*Their departures caused a decrease in revenues, as well as the default on a number of
contracts, which exposed the company to significant liabilities. Long-time customers grew
uneasy with what they perceived to be a rudderless ship and took their business to Joe's
competitors. Joe's bank grew uneasy as well and decided to call in his company's debt —
debt Joe personally guaranteed.*

*Within weeks of Joe's death, his key managers were gone, his company defaulted on a
number of contracts, revenues plummeted, customers jumped ship and any prospects of
securing replacement financing quickly disappeared.*

As you can see, business continuity planning is vitally important to your company.
Without a well thought out "survival plan," the consequences to employees, customers and
most importantly, your family and estate are dire. (Don't think that your estate will escape
the notice of your business creditors.)

Fortunately, there are a number of methods sole owners can implement today to help avoid
the type of business collapse that Joe Carpenter's business experienced.

First, to keep key employees on board after your demise, offer ownership — perhaps via a
buy and sell agreement, or offer additional compensation if key employees continue to run
the company. The amount of compensation can be directly tied to company profitability
and continued success. As an additional incentive, offer these employees a substantial
bonus (called a "Stay Bonus") for staying with the company — one that can be funded with
insurance and that can be accessed in case of your death.

Second, alert your bank to your succession plans. Meet with your banker to discuss the
arrangements you have made and show him or her that insurance to affect these plans is in
place. Make sure your creditors are comfortable with your succession plan. Ask them what
arrangements they would like to see in place.

Third, create a written plan that states: 1) who should take on the responsibility of running
the business; 2) whether the business should be sold (if so, to whom) continued or
liquidated; and 3) who your heirs should consult regarding the sale, continuation or
liquidation of the company.

Finally, work closely with a capable insurance professional to make certain the necessary

insurance (such as funding the Stay Bonus) is purchased by the proper entity, (you, your trust or the business) for the right reason and for the right amount.

Go to archive list of our newsletter

ORION CAPITAL GROUP, INC.

1134 Crane St., Suite 216 * Menlo Park, CA 94025

Website: www.orioncg.com * Email: info@orioncg.com

Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes ficticious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



## Preserve Wealth: Give it Away!
### (Step Seven)

The last step in your Exit Plan is Wealth Preservation Planning. But that doesn't mean you should wait until you are out of the business to begin actively preserving your wealth. In fact, if you wait until the value of your business is converted to cash, it may be too late to realize all of the benefits of wealth preservation. The most significant and powerful claimant to your wealth is the IRS — especially in the estate tax arena.

*George opened our meeting almost apologetically. "I knew I'd waited too long to begin gifting part of the company to my kids when I met with my CPA. She told me that, based on the company's pre-tax cash flow of $2 million per year, the company could be worth as much as $12 million to a third party. I had no idea! Since I don't need that much, I want to transfer at least half the value — at a lower valuation of course — before any possible sale. I'm looking at millions in gift taxes."*

*George hired a Certified Valuation Analyst (CVA) who valued the business at $9 million, a conservative but supportable valuation. The company's stock was recapitalized into voting and non-voting stock. Based on current tax case law, the CVA knew that she could justify discounting the value of non-voting stock (or a gift of a minority interest of the voting stock). In her opinion, the minority discount was 35 percent of the full fair market value of the stock. Even with the 35 percent discount, however, a gift of half of the company (now reduced to a gift of approximately $3 million) would cause the payment of a gift tax of approximately $500,000.*

*Like you, George was not particularly keen on paying a tax of $500,000. So he didn't. And he still gave away 50 percent of the company to his children. He did so by using the biggest lever in the Wealth Preservation Transfer Game: a "GRAT" — a Grantor Retained Annuity Trust.*

A GRAT is an irrevocable trust into which the business owner (and the Trustee of the GRAT) transfers some of his stock.

The GRAT must make a fixed payment (annuity) to the owner each year for a pre-determined number of years (in George's case, four years). At the end of this period, any stock remaining is transferred to the owner's children.

Stock transferred into a GRAT is treated as a gift — the amount of which is the value of the asset transferred *minus* the present value of the annuity which the owner will continue to receive. (George's advisors made sure that the present value of the annuity paid out over four years equaled the value of the stock transferred into the GRAT — therefore **no** gift was made by George.)

Another key to a GRAT's success is the transfer of an asset that appreciates in value and/or produces income in excess of 120 percent of the federal mid-term interest rate (currently about 6 percent).

Let's summarize what George did:

1. He transferred one-half of a business with a fair market value of $9-$12 million to his children in four years using none of his lifetime exemption.
2. He continued to receive all of the income from the company during that four-year period, because the annuity payment to George was designed to equal the amount of

Case5:10-cv-02641-LHK   Document1   Filed06/16/10   Page60 of 69

income expected from the stock transferred into the GRAT.
3.  At the termination of the trust (four years) the trust asset, consisting of one-half of the company, was transferred to trusts for George's children, *free of any gift tax*.

These trusts were in turn established by George when the GRAT was created and contained his wishes regarding when, and if, the children were to receive money from those trusts.

This is *huge leverage*. And best of all, planning techniques such as GRAT's and the careful use of minority discounts, as well as a variety of other estate tax avoidance techniques, are likely available to you and your family.

Your financial, legal and tax advisors can provide you with more information about this aspect of the planning.

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes ficticious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Why Business Owners Fail To Plan

*Franklin Taft was understandably a bit neurotic. He was increasingly anxious to begin planning for his eventual departure from his business but his concerns prevented him from proceeding. "I'm too busy working in my business to think about how to leave it. Besides, I don't know what to do-and neither do my advisors."*

Sound familiar? In our experience, the primary reasons owners hesitate to begin the planning process are:

1. You may be so busy fighting alligators that you don't have time to drain the swamp. Daily demands mean all of your time and energy are spent working in the business. You have little left to work on the business of leaving your business.

   **A solution:** spend a few hours learning what you need to know by reading *The Completely Revised How to Run Your Business So You Can Leave It In Style* and the provider of this newsletter can offer you additional material discussing Exit Planning.

2. Owners may be unaware that there is a defined Exit Planning process that provides a template showing them the steps they can take in order to help them leave their businesses "In Style."

3. Some lawyers, CPAs, insurance professionals and investment advisors-your professional advisors — may not know how to effectively work together to help you leave your business in style. If one of the professionals on your Advisory Team has provided you with a subscription to this newsletter, chances are good that he or she is informed and may specialize in helping owner/clients.

   **A solution:** *The Completely Revised How to Run Your Business So You Can Leave It In Style* book and the Companion Workbook provide the basics of the Exit Planning process. You need to know only WHAT needs to be done-a far easier task then learning HOW to accomplish what needs to be done. Leave the HOW to your advisors.

Finally, (and this wasn't a problem for Franklin) many owners have a fear of the unknown-what will they do after they exit their businesses.

At the risk of sounding like the dentist you feared as a child, "Trust me, it won't hurt." As a successful, smart business owner, you can both discover and create a new and fulfilling life apart from your business.

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



## Transfers to Insiders

When transferring your company to insiders, a Low Value can put Dollars in your pocket. Owners of successful businesses valued between $5 and $10 million face two difficult exit problems1:

1. Cash buyers are usually seeking larger companies; and
2. Owners are generally unwilling to assume a long-term installment note because of the risk of non-payment.

Given these hurdles, the owner has four transfer options:

1. Long term installment sale to employees;
2. Leveraged Management Buyout;
3. Employee Stock Ownership Plan; or
4. Modified installment/cash sale.

Let's look briefly at each.

### Long Term Installment Sale

In this sale, the former owner holds a promissory note that the buyers (employees) pay off over a seven to ten year period. The note is secured by the assets and stock of the business and the personal guarantees and collateral (usually residences) of the buyers. Little or no money changes hands at closing. Of course, if the new management cannot maintain the company's profitability, the owner does not receive his purchase price.

### Leveraged Management Buyout

An owner chooses this transaction structure when she wants to achieve the goals mentioned above and if her company has:

- A management team capable of operating and growing the business without owner input;
- Stable and predictable cash flow;
- Good prospects for future prosperity and growth; and
- A solid, tangible asset base.

Again, the key to this transaction structure is for the owner and management team to agree on a fair value for the company. Once agreed, the management team arranges the senior bank debt to fund a portion of the transaction. The bank, in turn, requires management to make an equity investment prior to closing. At this point, the management team finds and offers an equity investor a complete package of price, terms, debt financing and management talent.
If a private equity investor cannot be located under acceptable terms, the seller can elect to maintain an equity position in the company, or subordinate a term note to the bank.

### Employee Stock Ownership Plan (ESOP)

Avid readers of **The North Star Newsletter** recognize this transfer technique from our last issue. For our purposes here, in an ESOP arrangement, the owner is largely cashed out of the business, perhaps having to carry only a portion of the purchase price of the stock sold to management.

**Modified Buyout**

Of all the methods of "insider" transfers identified here, the Modified Buyout is the choice of many owners because it best meets the typical owner's objectives described earlier.

In a nutshell, an owner makes available a pool of non-voting stock (about 40 percent of total ownership) for current and future purchase by key employees. That stock is valued using an agreed upon Valuation Formula but adjusted downward using minority discounts *(to be affordable and to provide an incentive for employees to stay with the company.)* Employees purchase stock via a Stock Purchase Agreement. After the employees have paid for the stock (usually three to four years) the owner can then decide to:

1.  Sell the balance of the company to key employees at true fair market value for cash because they can likely get bank financing;
2.  Sell to an outside third party; or
3.  Continue to own the company.

The advantages to the Modified Buyout are:

- Acquiring part of the company at a reduced cost rewards and motivates key employees;
- Key employees knowledgeable in business and trusted by owner receive the entire business; and
- Owner receives all of the company's fair market value.

The disadvantages to the owner are that:

- He does not receive the entire purchase price for three to four years; and
- He generally remains active in the business until the initial employee buy-in is completed.

In summary, the Modified Buyout works because the low initial value:

- Allows a buy out with future cash flow;
- Reduces taxes; and
- Provides an incentive and sets up a low price for the eventual cash buy out.

Creating and implementing your Exit Plan can be the most important business and financial event of your life.

Go to archive list of our newsletter
ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.

Case5:10-cv-02641-LHK   Document1   Filed06/16/10   Page65 of 69



**ORION CAPITAL GROUP**

www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## ESOPs: Exit Opportunity for Business Owners

*Aesop is famous for his stories that teach important lessons but are fictional-and often fantastic. Our topic today, **ESOPs** (Employee Stock Ownership Plans) is similar. Fictional and often fantastic claims are made about what **ESOPs** can and cannot do. **ESOPs** can help business owners to achieve a number of important Exit Planning goals-namely, selling a business tax-free to employees for full market value. But as with a fable, readers must take care to separate the important lesson from the fiction. What can or should you believe about **ESOPs**? Read on.*

Business owners use **ESOPs** (Employee Stock Ownership Plans) as a tool to achieve three common Exit Objectives:

- To leave the business soon;
- To leave the business with cash adequate for financial stability; and
- To leave the business to employees

### What is an ESOP?

An **ESOP** is a qualified retirement plan, typically a profit sharing plan, that must invest primarily in the stock of the sponsoring employer. It is subject to a number of legal requirements.

Armed with that basic information, let's look at how an **ESOP** helped one ficticious owner to achieve his Exit Objectives.

*Steve Victoria was the sole owner of VECI, a 35-person firm with annual revenues of $5 million and cash flow of $500,000.*

*After exploring a sale to a third party, Steve's business broker suggested that a cash sale was unlikely. A sale to employees was also problematic given their inability to obtain meaningful financing.*

*Until Steve came across an article about **ESOPs**, he thought that his only exit option was to gradually diminish his involvement in the hope that VECI could continue to distribute earnings to him. The article outlined a far different exit option. It said that Steve could cash out for fair value, his employees could own his company and, best of all, Steve would pay no taxes on the sale.*

Steve wasted no time contacting his advisors to see if an **ESOP** could work for him. His first question was: What companies are suited to an **ESOP**?

**ESOPs** do not work well for every company. To be successful, a company should have:

- Strong cash flow;
- A good management team that can carry on after an owner's departure;
- Little or no permanent debt;
- A relatively large payroll base;
- An alignment between shareholder and employee interests; and
- Adequate capitalization to sustain future growth.

### ESOP Advantages

The biggest advantage in the minds of many owners is the fact that the funding of a purchase by an **ESOP** is accomplished via pre-tax instead of post-tax dollars. Running a close second is that if, after an **ESOP** purchases the owner's C corporation stock, the **ESOP** holds at least 30 percent of the corporation's outstanding stock, the shareholder's proceeds are tax-free so long as they are invested in U.S. stocks and bonds.

Finally, national surveys indicate that a company's productivity improves after an **ESOP** is instituted.2

### ESOP Disadvantages

For every silver lining there is a cloud and **ESOPs** are no exception.

- First, using (or establishing) an **ESOP** as your exit vehicle is expensive. Expect to pay between $25,000 and $100,000 depending on the complexity of your situation.
- Second, ERISA, the body of law that governs **ESOPs**, imposes significant responsibilities on its fiduciaries so that the interests of the participants and beneficiaries are represented and achieved. In fact, the sale of an owner's stock to an **ESOP** must be an arm's length transaction between the owner and an independently-directed and administered **ESOP**. If an owner makes any decision for the **ESOP** regarding the purchase or financing of his stock, he exposes himself to lawsuits claiming a breach of fiduciary obligation to the **ESOP** and its participants.
- Third, because an **ESOP** is required to repurchase stock from terminating employees, companies must make significant cash contributions to cover this liability — cash that would otherwise be used to grow the company.
- From the employee's perspective, **ESOPs** are not always welcomed with enthusiasm. Key management groups are given total ownership responsibility but must share the reward with other employees.
- And last, but not least is the lending bank's requirement that the **ESOP** have equity in the transaction before it will loan the **ESOP** the funds necessary to purchase the owner's stock. To create this equity, the company must pre-fund the **ESOP** with cash that otherwise would have been bonused to the owner.

Having weighed the pros and cons of **ESOPs**, Steve decided, with the help of his advisors, to pursue this exit strategy.

First, he had to set his objectives. Steve decided that he was willing to remain with VECI for two to three years and he wanted $2 million (after-taxes) from the sale.

Second, Steve hired an investment banker as his valuation expert to perform a preliminary valuation, the purpose of which was to determine if Steve's financial objective ($2 million after-tax) could be met.

Third, Steve had to develop a key employee incentive plan that would keep the key employees on board before and after Steve's departure.

Fourth, Steve's attorney drafted the **ESOP** document to comply with the many ERISA requirements regarding vesting, participation, and fiduciary duties. Attorneys also drafted the necessary documents to ensure the continuity of the company (should Steve die before the **ESOP** transaction could take place) and to provide for Steve's family (in the event of his death). The **ESOP** was then funded with cash contributions for three years, after which it was able to obtain bank financing sufficient to pay Steve the entire purchase price.

The final result? After 3 years, Steve sold his interest to the **ESOP** for $2.5 million. The bank required that he pledge half as collateral, to be released as the loan was paid down. Because Steve acquired blue chip stock and bonds, he was able to avoid the capital gains tax on the sale of his stock to the **ESOP**.

Go to archive list of our newsletter

ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

## ©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.



www.orioncg.com
Exit Planning • Growth Capital • Valuations • Sell-Side M&A
*Building & Selling Corporate Value with World Class M&A Services*

## Sole Owner Continuity Plan: Making Sure the Business Continues When You Don't

*Greg King barely survived helping his oldest son learn to drive and now it was time to teach his younger son. Before putting himself through on-the-road training one last time, Greg called his life insurance representative. "I have no co-owners to buy my company if I don't come home. What can I do?"*

Like many businesses, Greg's company (King Aviation Services) was not co-owned. And, like other such businesses, there was no plan to continue the business if something happened to the owner. This may be true in part because owners (like Greg) may not think about it and in part because some advisors may not raise issues that they may not be educated in. (After all, how do you continue a business when the only owner goes to the Big Hangar in the Sky?)

Fortunately, Greg's insurance representative was familiar with a solution called a Sole-Owner Continuity Plan (SOCP).

The challenge for Greg, and many sole-owners, is to provide for the business's continuity. That can be accomplished by securing the continued services of those employees who are indispensable to the business. If Greg does not return, the remaining employees may believe the survivability of the business (and their salaries) could be at great risk. Often, they, too, may leave. Without you and without the company's most valuable employees the business may not continue long enough to be sold, transferred, or even liquidated, on a financially sound basis.

For sole owners, the vital question is: how do you prevent these employees from leaving? One answer: bribe them. Your business should create a plan to compensate them at a substantially increased level (usually 50% to 100% more than they ordinarily receive) and *guarantee that payment with cash.* This plan is known as a Stay Bonus Plan and it is the first element of a sole owner continuity plan.

### Stay Bonus

A stay bonus is a written, funded plan that provides monthly or quarterly bonuses, usually over a twelve to eighteen month period, for key employees who remain with the company during its transition from your ownership to new ownership or is liquidated in an orderly way. (New ownership may be a third party, employees, or family members.)

Typically, the stay bonus is funded with life insurance in an amount sufficient to pay the bonuses as well as to continue the normal salaries of your important employees over the specified time period. This insurance may be owned by the company or outside the company in an estate tax-sensitive trust. The plan is communicated to the important employees when it is created so that they know the plan and the money to fund it exist.

### Business Continuity Instructions

The second element of the sole-owner continuity plan addresses the need for you, the owner, to communicate — in writing — to advisors and to family members what you want done with the business upon your death or permanent incapacity. Your instructions should cover three important issues.

- First, what key employee(s) can be given the responsibility to continue and to supervise business operations? Make financial decisions? Oversee internal administration? Owners should name names.
- Second, what advisors and others (such as a friendly competitor) should be consulted in the ownership transfer process? Again, owners should be specific.
- Third, do you want the business to be sold? If so, make a list of names and contacts of businesses that have expressed an interest in acquiring the company or who you think would be appropriate successor owners. On the other hand, you may want the business sold to key employees, continued in the family or liquidated. Whatever your choice, it must be made during your lifetime. Is there a better time than the present to do so?

Finally, once an owner has tackled these three issues, he or she should communicate those desires to family members and to advisors. This is the second element of the SOCP and can be easily accomplished using a Business Continuity Instruction Form(available through the provider of this newsletter).

The task of contemplating your demise can be made easier (for you and for your family) if you create and fund a stay bonus plan and complete a Business Continuity Instruction Form — sooner rather than later. Doing so is crucial if your business is to continue long enough to help provide your family the financial support you have worked so hard to achieve. To begin executing your Sole-Owner Continuity Plan, click on the above links to contact the provider of this newsletter.

Go to archive list of our newsletter

ORION CAPITAL GROUP, INC.
1134 Crane St., Suite 216 * Menlo Park, CA 94025
Website: www.orioncg.com * Email: info@orioncg.com
Phone: (650)752-4873

©Orion Capital Group. All Rights Reserved

DISCLAIMER: The information contained in this article is general in nature and is not legal advice. For information regarding your particular situation, contact an attorney or tax advisor. This newsletter is believed to provide accurate and authoritative information related to the subject matter. The accuracy of the information is not guaranteed and is provided with the understanding that none of the providers of this newsletter is rendering legal, accounting or tax advice. In specific cases, clients should consult their legal, accounting or tax advisors.

The example provided is hypothetical and for illustrative purposes only. It includes fictitious names and does not represent any particular person or entity.

Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS under circular 230, we inform you that any U.S. Federal tax advice contained in this communication, unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing, or recommending to another party any matters addressed herein.